### STATE v. SAWTELLE.

An order of court may be made in accordance with a rule of a telegraph company for the production of telegrams, against the objection of the party who sent them.

Whether an infant under the age of fourteen is qualified to testify, and whether evidence is or is not admissible because of its remoteness, are questions of fact to be determined at the trial term.

When an indictment for felony contains a second count charging the defendant as accessory before the fact, a denial of his motion that the state be required to elect on which count the trial shall be had is not error.

The challenge of a juror on the ground of preconceived opinion is a challenge to the favor.   Whether he is indifferent is a question of fact to be determined at the trial term.

INDICTMENT, for the murder of the defendant's brother, Hiram F., at Rochester, February 5, 1890.

Kimball, a witness called by the state, testified that he was

station agent at Rochester, and manager of the Western Union Telegraph Co., and produced a printed copy of the following rule of the company : " Whenever a manager or other employé is subpœnaed on the part of the sender or addressee of a message to produce it before a court or other legal tribunal, he will comply with the subpœna, and afterward return the message to the files ; but whenever a manager or other employé is subpœnaed on the part of any person other than the sender or addressee to produce a message, or testify in relation thereto before a court or other legal tribunal, he will take the message into court, and then submit to the judge that he ought not to produce it or testify in relation thereto, and that he cannot do so unless a rule or order of the court be entered requiring it, for the reason that telegraphic messages are of a confidential nature, and that the communication is claimed to be privileged. If such order be made and entered it will be obeyed, and the clerk of the court will then be requested to furnish a copy of the order, which, together with the subpœna, will be filed with the message to which it relates." Being requested by the state's counsel to produce a telegram sent by the defendant February 4, 1890, from Rochester to Hiram at Boston, and another sent by the defendant February 5, from Rochester to Hiram's wife, Jeannette, at Boston, the witness made the objection prescribed by the above rule. The court made the order mentioned in the rule, and the defendant excepted. The witness produced the following original telegrams, called No. 1 and No. 3 :

No. 1.                                    " ROCHESTER, 4, '90.
" To H. F. Sawtelle, 1275 Washington Street, Boston, Mass. ;
    Marion very sick abed. Grippe. Feverish and growing worse. Mother says come. Will meet you at depot. Answer.
                                                        ISAAC."

No. 3.                                    " ROCHESTER, 5, '90.
" To Jenet Sawtelle, 1275 Washington Street, Boston, Mass. :
    Somewhat better. Take next train. Will meet you depot, Rochester, N. H.                                    ISAAC."

Horne, a messenger in the telegraph office in Rochester, testified that on the 4th of February, 1890, he saw the defendant write telegram No. 1 in the Rochester station, and give it to the telegraph operator; and Wilcox, the operator, testified that he sent it the same day. Horne also testified that the next day the defendant wrote No. 3, and Horne gave it to the operator; and the operator testified that he sent it. Subject to the defendant's exception, No. 1 and No. 3 were admitted in evidence.

Jeannette testified that in the evening of February 4, 1890, " we " (apparently meaning her husband and herself) received No. 1 in Boston. A copy of a message, called telegram No. 2, being shown to Wilcox, he testified that it came to him over the wire.

No. 2.                              "BOSTON, Mass., 2, 4, '90.
"Isaac Sawtelle, Rochester, N. H.:

What time and place will you meet me? Is she dangerous?
Answer.                                    JEANNETTE SAWTELLE."

Jeannette testified that she left No. 2 at the telegraph office in
Boston, late in the night of February 4, 1890, to be sent the next
morning if she did not then call at the office. The defendant
objected to the admission of No. 2, on the ground that there was
no evidence that he received it. The court ruled that there was
such evidence, and admitted No. 2; and he excepted.

Marion Sawtelle, a girl evidently less than fourteen years of age
(daughter of Hiram and Jeannette), being called as a witness by
the state, the defendant objected to her being sworn. In answer
to questions by the court, she said,—I am eight years old. Have
been at school—the Winthrop Street school; went to school last
summer. Understand that as a witness I should be bound to tell
the truth. If I did not tell the truth, God would punish me. No
questions were proposed by counsel, and no other evidence than
her answers and appearance was offered on the question of capac-
ity and understanding. The court found that she was competent,
and allowed her to be sworn and to testify; and the defendant
excepted.

February 14, 1890, a headless corpse was found buried in the
woods in Lebanon, Me., several miles from Rochester. There was
evidence tending to show it to be the body of Hiram. Subject to
the defendant's exception, E. Pierce testified that in summer not
more than a dozen teams a month passed over the road near the
grave, and that there was very little, sometimes not any, travel
there in winter.

There was evidence tending to show that late in the afternoon
of February 5, 1890, the defendant carried Hiram in a buggy from
Rochester village, on the road that passes by the Morrill barn, and
killed him at or near the barn. Subject to the defendant's excep-
tion, W. Dunnell testified that on the 10th day of February, 1890,
he saw the tracks of a horse and wagon near the barn; that the
tracks went through the bars slanting, as if coming from the direc-
tion of Rochester village, and turned round, near the back side of
the barn, towards the bars.

Judgment was rendered on a verdict of guilty; and the defend-
ant filed this bill of exceptions, which is allowed.

On two other grounds the defendant moved to set aside the ver-
dict. There was no probability that twelve jurors, qualified in
other respects, could be found in the county who had not formed
an opinion that the defendant was guilty of murder in New Hamp-
shire or Maine. If all who had formed such an opinion were
rejected, he could not be tried. The common-law rule and the
meaning of the statute were taken to be, that in all cases, civil and
criminal, each party is entitled to a fair trial; that a man is not

disqualified to be a juror by an opinion formed upon hearsay, oral and printed, if he can and will try the case solely upon the evidence according to his oath, uninfluenced by that opinion or that hearsay; that the trial is not rendered unfair by the opinion or the hearsay, if they will not affect the verdict.

In challenges for cause, the defendant was limited to the right of a fair trial without the latitude generally allowed in civil and criminal cases where there is no difficulty in procuring jurors who have not formed an opinion and have not heard much concerning the case. All jurors returned were informed at the outset that those who tried the case would be sworn to try it according to law and the evidence. Full explanation was given of the duty of deciding exclusively upon legal evidence given by sworn witnesses on the stand, and discarding all hearsay and previous opinion; and during the impanelment the explanation was several times repeated, with due emphasis, in different forms, and with specific applications. A juror who had been examined by the court, and had sworn that he would try the case on the evidence alone, unbiased by his previous opinion, being examined by the defendant's counsel, said the opinion he had formed was so strong that it would require evidence to change it. The court understood his meaning to be, that in the exercise of the right of free thought, and aside from a juror's obligations, his opinion would not be changed unless it was shown to be wrong or groundless; and on being again questioned by the court, he said if he tried the case as a juror, he should do his duty according to the explanation that had been given of it. The court found him competent; and he, and another who gave similar answers, were impanelled with others who were not asked whether evidence would be required to change their opinions, but who undoubtedly would have made similar answers.

There was a second count, under Gen. Laws, *c.* 284, *s.* 3, charging the defendant as accessory before the fact in New Hampshire to the murder of Hiram committed in Maine by some person unknown. The court denied the defendant's motion to require the state to elect on which count the defendant should be tried. The verdict was on the first count.

*J. A. Edgerly, J. H. Worcester,* and *G. F. Haley,* for the defendant. A juror who had been examined by the court, and had sworn that he would try the case on the evidence alone, unbiased by any previous opinion, being examined by the defendant's counsel, said the opinion he had formed was so strong that it would require evidence to change it. The court understood his meaning to be, that in the exercise of the right of free thought, and aside from a juror's obligations, his opinion would not be changed unless it was shown to be wrong or groundless; and on being again questioned by the court, he said if he tried the case as a juror, he should do his duty according to the explanation that had been given of it.

The court found him competent; and he, and another who gave similar answers, were impanelled with others who were not asked whether evidence would be required to change their opinions, but who undoubtedly would have made similar answers.

It is a cardinal rule, always to be borne in mind, that the accused is entitled to be tried by a fair and impartial jury. The language of Lord Coke, often quoted, that "the juror must stand indifferent as he stands unsworn," expresses a rule of justice as well as a rule of law. The rule that an opinion formed by a juror upon the guilt or innocence of a prisoner operates as a disqualification, is based upon the theory that such a prepossession of the mind is inconsistent with the exercise by the juror of a free and impartial judgment of the case upon the evidence; and the declaration of the juror that he believes he could try the case uninfluenced by his previous opinion, has been repeatedly held not to remove the objection, for the reason assigned by Chief Justice *Marshall,* in *Burr's Case,* that "the law will not trust him." That distinguished jurist further says,—"He will listen with more favor to that testimony which confirms than to that which would change his opinion. It is not to be expected that he will weigh evidence or argument as fairly as a man whose judgment is not made up in the case." The theory of the law is, that a juror who has formed an opinion cannot be impartial. Wherever there is existing prejudice, it should disqualify, for prejudice is a state of mind which in the eye of the law has no degrees; so the objection of bias made to a juror being once established, it would seem that no possible combination of circumstances can remove the disqualification. *People* v. *Reyes,* 5 Cal. 347; *State* v. *Dumphey,* 4 Minn. 438.

No part of the examination of jurors in reference to their competency is so troublesome as that which relates to the opinions they have formed about the merits of the cause to be tried. In the consideration of this subject, an estimate has to be made as to the various operations of the human mind, as to its capacity to rid itself of previous impressions and to weigh and examine evidence which may counteract those prepossessions, and as to its ability to act against its predilections or prejudices. In fact, an account has to be taken of psychological phenomena, whose laws we but imperfectly understand, and which do not operate alike in all individuals. This is well expressed by Judge *Scott,* in *Armistead* v. *Com.,* 11 Leigh 657, where he says,—"Some minds are so skeptical that they receive nothing as true which is not proved by plain and direct evidence, or established upon mathematical demonstration, while others readily adopt the most absurd notions, though unsupported by anything like evidence, and destitute of all foundation in reason and in the nature of things; and we not unfrequently find opinions of the latter class as immovable as those which are the result of the most laborious investigation. The mind is, however, in both cases, made up; the question is settled;

it is decided; and although both classes of persons may say, and believe they say truly, that they are open to conviction, willing to hear evidence and listen to reason, and either adhere to or abandon their opinions as these may dictate, few would be willing to stake their lives and fortunes on the success of an attempt to overturn opinions which their professors fancy themselves to be thus willing to abandon at the command of truth and justice.  When we have made up an opinion on any question, we more easily recall the conclusion at which we arrive than the process by which we arrived at it; but when, upon examination, that process is brought to our attention by others, or by an effort of our own memory, we are prepared to yield our assent to it, and far more readily adhere to our former opinions than adopt new ones."  "It cannot be denied that opinions formed without deliberation are sometimes adhered to with as much obstinacy as those which have been the result of the most patient inquiry."  "The opinion will, generally, be more or less decided, according to the nature of the evidence on which it is founded.   But if it be decided, he who entertains it is not the better qualified to discharge the important duty of a juror because he has founded it on common report.   A philosophic mind, accustomed to arrive at truth by painful and laborious research, may wonder that a rational being should pronounce his fellow-man guilty of moral delinquency upon no better evidence than common report; yet the evidence of history and our own observation prove that such things have happened, and do happen daily.   The benignity of the law has thrown around all who are put upon their trial for crime, its protection against this imperfection of human reason and human justice.   Therefore, if there is good cause to believe that the accused has been prejudged by a large portion of those from among whom his triers are to be selected, the venue is changed; and equal care is taken when he stands upon his deliverance that his fate shall not be placed in the hands of men by whom he is already condemned.   We therefore reaffirm the rule laid down in Osiander's case (3 Leigh 780), that he who has formed and expressed a decided opinion that the prisoner is guilty or innocent of the offence for which he is about to be tried, whether that opinion be formed on the evidence of witnesses whose testimony he has heard on a former trial, conversation with witnesses, or common report, is not fit to sit upon his trial.   We go further, and say that it is immaterial whether that opinion has been expressed or not.   It is vain for a man in this state of mind to say that he would give the prisoner a fair trial; that he was not prejudiced against him; that he would judge him by the evidence, and decide according to the evidence.   Whatever confidence he may have in his ability to erase from his mind the impressions made, the law has no confidence in him; however willing he may be to trust himself, the law will not trust him."  37 Am. Dec. 633.

In *Cancemi* v. *The People*, 16 N. Y. 503, the court say,—" It is stated, in the bill of exceptions brought up to this court by the writ of error, that Alexander Kyle, one of the jurors sworn and who sat upon the trial of the indictment, on being called as a juror, was challenged for principal cause, and being examined under oath, testified, on his direct examination, that he had formed an opinion and expressed it, and on his cross-examination, that he had no fixed opinion, none which could not be removed by the evidence. The court thereupon overruled the challenge, on the ground that it did not appear that the juror had a fixed and absolute opinion, and the defendant excepted. The testimony of the juror on the challenge does not disclose clearly the precise state of his mind in relation to the case; but, on the contrary, it is ambiguous, and susceptible of different constructions. That portion of it elicited on his direct examination, that he had formed and expressed an opinion standing alone, would have called for his rejection; the residue, given on his cross-examination, that he had no fixed opinion, none which could not be removed by the evidence, may be interpreted as qualifying the previous statement, and to mean that he had only a hypothetical impression not affecting his indifference as a juror. It may, on the other hand, be interpreted to import merely that the opinion which he had formed and expressed was not so fixed that it might not be controlled by the evidence,—regarding the latter branch of the expression as explaining and defining what the juror intended by saying he had no fixed opinion. In this view the ordinary force of his testimony, that he had formed and expressed an opinion in the case, would not be impaired. This testimony should be construed with liberality to the defendants, in the humane spirit which pervades our criminal laws and the rules of their administration. The right secured by law to a fair and impartial jury, with minds open to receive and weigh the evidence, and balance in regard to the matters to be tried, is of the highest importance, and should be carefully guarded by the courts, especially in cases involving human life. In our opinion the latter interpretation above stated should prevail, and upon that construction the juror was clearly disqualified. His mind was preoccupied with an opinion upon the issue to be tried, which it would require evidence to remove; and that, upon principle and all the cases, incapacitated him for a juror."

In *Greenfield* v. *People*, 74 N. Y. 283, the court say,—" It is well to determine here just what weight is to be given to the word 'impression,' used by these persons in describing their state of mind. They seek to distinguish it from an opinion. But one of them says that it was such an impression as would lead him to a belief or opinion of the guilt of the prisoner, and of that strength that it would take evidence to remove it, and that he made a slight distinction between an impression and an opinion. The other

said that he styled his mental state more an impression than an opinion, but that he had an impression as to his guilt, and did not directly answer the question whether it would take testimony to remove it, saying that he would answer that if he accepted the obligation of a juror.    Now it has been held that only an impression of guilt, if nothing which deserves to be called an absolute opinion, will not sustain a challenge for principal cause, where the juror sometimes had doubts as to guilt, and so far as any opinion has been formed, it was contingent and hypothetical.    But it is clear that the jurors in this case had more than a doubt.    There had been an effect produced upon their minds which remained, and which was so firmly lodged there that it needed a new coming force to dislodge it.    They had received it into their minds as true that the prisoner was guilty, without certain knowledge of it, but upon proofs which they held satisfactory, and it matters not what the state of mind thus produced is christened, whether an opinion or an impression.    There was existing such a decision of mind as to his guilt as that further proofs must be produced before that decision would be changed.    So that we are justified in treating the conclusions of these jurors, as to the guilt of the plaintiff in error, as equivalent to what the books call an opinion, when treating of this subject "

" It thus appears that the plaintiff in error was tried and found guilty of murder in the first degree by a jury, two of whom had formed, and one of whom had expressed, such an impression that he was guilty, which impression each of the two still had when he went into the jury-box ; an impression so strong as that, in the case of one of them, it would need testimony to remove it, and in the case of the other it did not affirmatively appear that it would not, and it was clearly to be inferred that it would.    On the other hand, the jurors who were challenged each professed a purpose to render a fair and impartial verdict upon the evidence, and each stated his belief to be that he could and would do so.    The fact that each of these two jurors started upon the trial of the plaintiff with an impression against him is sure.    It is a matter of that kind which, though resting in unseen mental operations, is still capable of positive ascertainment.    Impression or no impression is a matter which can be determined as positively as any other mental cognizance.    When these persons stated that they had an impression that the plaintiff was guilty of the crime with which he was charged, they spoke of a matter which existed to their consciousness as plainly as any other operation of the mind of which they took note.    But when they stated that they would hear the evidence impartially, and would render a verdict without being affected by that impression, it is clear that they were not speaking of an ascertained fact, but only of a purpose of mind, the carrying out of which depended very much upon the strength of will and general mental capacity of each of them.    It was a matter entirely

uncertain and problematical, which might or might not be attained. And it is said, in *People* v. *Mather*, 4 Wend. 229, that too much stress is not to be laid on such a declaration of a juror, inasmuch as the disqualifying bias which the law regards is one which operates unconsciously on the juror, and leads him to indulge his own feelings when he thinks he is influenced entirely by the weight of evidence ; and that if he is sincerely determined to discard his prejudices he is not to be received, because the law does not hold him capable of doing so."

This decision was made after the passage of the statute of 1872, providing that the previous formation or expression, and the present holding, of an opinion or impression, in reference to the guilt or innocence of the persons, shall not be sufficient grounds of challenge for principal cause, if the challenged person declares on oath that he verily believes that he can render an impartial verdict according to the evidence, and that such previously formed or expressed opinion or impression will not bias or influence his verdict, and if the court is satisfied that such person does not have such a present opinion as will influence his verdict. Laws of New York, 1872, *c.* 475, *p.* 1133.

The law of New Hampshire provides that "if it appears that any juror is not indifferent, he shall be set aside on that trial." G. L., *c.* 213, *s.* 23.

The definition of indifferency was given by Judge *Woodworth*, in *People* v. *Vermilyea*, 7 Cow. 122, as follows: "What is the meaning of a person standing indifferent? Manifestly, that the mind is in a state of neutrality as respects the person and the matter to be tried; that there exists no bias, for or against either party, in the mind of the juror, calculated to operate upon him; that he comes to the trial with a mind uncommitted, and prepared to weigh the evidence in impartial scales." The correctness of this definition has never been questioned by any court, and never can be until common sense and reason shall cease to exist. If we apply this definition to the case at bar, who can say that the jurors were indifferent, and that they were competent to sit in judgment upon a human life. "It is admitted that every citizen, whether arraigned for a crime or impleaded in a civil action, is entitled to a trial by a fair and impartial jury. The trial by jury is justly considered an invaluable privilege; but it would become a mockery if persons who had prejudged a case were admitted as impartial triers." Judge *Woodworth*, in *People* v. *Vermilyea*, *supra:* "It is the object of the law to obtain impartial, unbiased, fair-minded men for jurors. It would be grossly unfair and unjust, and against all the traditions of our race, to compel any person to go to trial before a jury that had formed an opinion as to his guilt. Indifferency is one of the common-law characteristics of a jury, and it is inviolably secured by the constitutional guarantee of jury trial. A party put upon trial for a crime has a

constitutional right by challenge, or in some other mode, to protect himself against a biased jury." *People* v. *Casey*, 96 N. Y. 115. It was said by Chief Justice *Marshall*, in *Burr's Case* (1 Burr's Trial 370), that it was one of the clearest principles of natural justice that a juryman should come to the trial of a man for his life with a perfect freedom from previous impressions; and he accordingly held that jurors who had formed opinions from newspaper publications and common rumor were incompetent. This principle was recognized in the trial of Peter Cook at the Old Bailey in 1696 (13 How. State Trials 334). Peter Cook was indicted for high treason. He thus addresses the court: " My lord, before the jury is called, I am advised that if any of the jury have said already that I am guilty, or they will find me guilty, or I shall suffer, or will be hanged, or the like, they are not fit or proper men to be of the jury." To which Lord Chief Justice *Treby* replied, "You say right, sir; it is a good cause of challenge." The lord chief justice further remarked, " but if any man in this panel have any particular displeasure to the prisoner, or be unindifferent, or have declared himself so, I do admonish and desire him to discover so much in general; for it is not fit, nor for the honor of the king's justice, that such a man should serve on the jury." Judge *Woodworth*, in *People* v. *Vermilyea*, *supra*, says (*p.* 126),—" I have not found a single adjudged case, since the case of Peter Cook, controverting the opinion there expressed. I apprehend that no adjudged case can be found in any of the courts of this country, where a juror has been admitted who has formed or expressed a decided opinion on the merits of the case." The learned judge further says (*p.* 128),—" If I have not erred in what I have already said, the law does presume that the expression of an opinion on the merits of a case indicates bias, or that the mind of the jury is decidedly unfavorable to the defendants. It is then a principal cause of challenge. All the authorities I have cited prove this to be correct. When the law has declared the consequences of a fact, and the fact be established, it becomes the duty of the court to make the application." " Upon the reason of the thing, the authority of adjudged cases, and the general understanding of the bench and bar, I have no doubt that the law is not chargeable with such injustice as to warrant the admission of a juror, who, from a knowledge of the facts, or information derived from those who knew the facts, shall have formed or expressed an opinion." *Ib.*, *p.* 126. This case was cited with approval in *People* v. *Mather*, 4 Wend. 229, 241, 242, wherein the court say,— " We are asked in this case to distinguish between an opinion formed by being an eye-witness to a transaction, or by hearing the testimony of those who were such witnesses, and an opinion founded on rumors, reports, and newspaper publications, and to say the former shall be evidence of partiality, and the latter not. If any distinction is to be recognized, I should be inclined to adopt

the reverse of that contended for at bar, . . . of those who entertain an opinion of the guilt of the accused before his trial, that they believe on the slightest evidence, or no evidence at all, manifest, in my judgment, a state of mind less prepared to receive and allow a fair defence than those who believe on proof which furnishes *prima facie* evidence of guilt." On this point Chief Justice *Marshall*, in the trial of Burr, says,—" If it be said that the juror has made up his opinion, but has not heard the testimony, such an excuse only makes the case worse; for if a man has decided upon insufficient testimony, it manifests a bias that completely disqualifies him for the functions of a juryman." Judge *Scott*, in *Armistead* v. *Com.*, *supra*, says,—" If the inquiry should lead to the conclusion that the opinion under examination is a decided one, its having been formed without due consideration, so far from removing the disqualification, it adds to it; it proves that the man who would thus lightly decide upon the guilt of his fellow-man is unfit to take his seat among the good and lawful men who alone should sit upon the trial." In *People* v. *Mather*, *supra*, Samuel Clark was called as a juryman, and testified that he had read several accounts of the abduction of Morgan, and had formed an opinion. The judge charged the triers that if they believed that he had a fixed opinion which it would require testimony to remove, he was disqualified, whether that opinion was founded on rumor alone, or on rumor and printed statements; which instructions were held correct on appeal.

In *State* v. *Webster*, 13 N. H. 492, where a prisoner was tried by the first jury upon an indictment and found guilty, another indictment being then pending against him, the evidence in the trial tended to show that he was guilty of the offence charged in the other indictment also. Several members of the second jury were present during the trial, and upon being inquired of, answered that they had formed an opinion from the evidence therein. Counsel for the prisoner then objected to his being tried on this indictment by the second jury, on the ground that they were not impartial, and had prejudged the case. The objection was overruled. A motion was made to set aside the verdict, and the opinion was by Judge *Gilchrist* as follows: " If it could be supposed necessary in any case to refer to written law in support of so plain a proposition as that all judicial tribunals should be impartial, we could find it expressed with all needful precision in the constitution of this state. The thirty-fifth article of the bill of rights declares it to be the right of every citizen to be tried by judges as impartial as the lot of humanity will admit." And although the judges of our superior court were there particularly alluded to, the spirit of the sentence pervades the constitution throughout. The ninth section of the act of July 4, 1827, provides that a juror may be put to answer upon oath, among other things, whether he is sensible of any prejudice in the cause; and the

same section also enacts that if it shall appear to the court that the juror does not stand indifferent, he shall be set aside and another appointed in his stead.    But even without these provisions, the commonest regard to justice would require that a party should not be compelled to trust even his property—much less, as in this case, his reputation and liberty—to the action of a tribunal by whom the merits of his case had been prejudged.   It is immaterial in what manner a juror becomes biased.   The question is, Is he impartial, or is he not?   He would be unfitted to do justice to the parties, whether he derived his impressions from reading the newspapers, from common report, from casual conversations with his neighbors, or from hearing witnesses testify in a court of justice. His presence in court, in the jury-box, where he had not only the right to be, but where the law required him to appear, is no reason for holding that prejudices acquired in the court-house are any more sacred things than prejudices acquired elsewhere, and that with these prejudices he should be allowed to sit in judgment upon his fellow-man.   We are of opinion that the objection taken by prisoner's counsel should have been sustained by the court, and that the prisoner should not have been tried by the second jury. The verdict must be set aside, and there must be a new trial."

If a juror have an opinion as to the guilt or innocence of the accused, even if based solely on newspaper reports, so fixed as to require evidence to remove it, he is not competent, although he may believe that he can render an impartial verdict on the evidence.   *Jackson* v. *State*, 77 Ala. 18; *Polk* v. *State*, 45 Ark. 165, overruling *Casey* v. *State*, 37 Ark. 67; *Andrews* v. *State*, 21 Fla. 598; *State* v. *Miller*, 29 Kan. 43; *State* v. *Ricks*, 32 La. Ann. 1098; *Stephens* v. *People*, 38 Mich. 739; *Olive* v. *State*, 11 Neb. 1; *People* v. *Casey*, 96 N. Y. 122; under Code, Crime, Proceed., s. 376; *McHugh* v. *State*, 38 Ohio St. 153; *Rothschild* v. *State*, 7 Tex. Ct. App. 519; *Spear* v. *State*, 16 Tex. Ct. App. 98; *Nelms* v. *State of Miss.*, 53 Am. Dec. 97.

The plan upon which the defendant in this case was tried, so far as the selection of jurors is concerned, is embodied in the following statement by the court in the printed case: " In challenges for cause, the defendant was limited to the right of a fair trial without the latitude generally allowed in civil and criminal cases where there is no difficulty in procuring jurors who have not formed an opinion and have not heard much concerning the case." Who ever heard before that a man on trial for his life was to be deprived of the latitude generally allowed in civil cases in the selection of his jury?   Such a proposition will strike the average mind as simply monstrous.   Where is there any authority for holding that the court shall take judicial notice, or can conclusively find without actual trial of the matter, that it is difficult in any degree to find a jury the members of which have not formed an opinion?   What reason was there for the adoption of such a

course? The facts in the case show nothing to justify it. The only ground on which it is or can be pretended that the admission of a juror who had formed an opinion so strong that it would require evidence to remove it is competent, is the difficulty, amounting practically to an impossibility, of procuring jurors who had not formed such an opinion. What reason had the court for assuming that there was anything more than the usual difficulty in obtaining a sufficient number of jurors who had not formed opinions on the merits of the case? In the case of *State* v. *Howard*, 17 N. H. 171, cited by the court as the justification for its course, one hundred and fifty jurors were called without completing the jury, and before the court ruled " that it was not a sufficient legal objection to a juror that he had heard about the case, but had not formed any opinion, and was not sensible of any bias," and in that case it took the court three days to impanel the jury, while in the case at bar less than three hours was consumed in impanelling the jury, and less than fifty jurors called and examined. In that case the court did not set aside the verdict against the prisoner on account of expressions of hostility said to have been made towards him by jurors, who sat on the case, before the trial, but not known to the defendant until after the trial. But the court said,—" Still we have no doubt that if evidence now presented by the defendant respecting the expression of opinion by those jurors had been offered in support of challenges when the jury was impanelled, it would have been regarded as sufficient and the juror set aside without further inquiry, unless proof of the language attributed to the juror should be distinctly contradicted."

Never in the history of the criminal law has any juror been considered qualified to act on a case, who admitted on examination that he had formed an opinion so strong against the prisoner that it would require evidence to change it—still less one whose opinion was so strong and fixed as to give the court to understand " that in the exercise of the right of free thought, and aside from a juror's obligation, his opinion would not be changed unless it was shown to be wrong or groundless." In such a state of mind would it not be absurd to say that the juror was indifferent? If that opinion did not disqualify him, the rule must be that no person would be disqualified unless he should declare that his opinion was so strong that he would convict regardless of evidence.

There is a suggestion in the case that the juror by taking his oath at once becomes divested of all opinions previously held, and all prejudices. But experience shows, what all the adjudged cases recognize, that human nature is not capable of doing so. By becoming a juror and taking an oath he does not cease to be human, or cease to be influenced by human motives or biased by human prejudices. He is then no more capable of disregarding an opinion that would require evidence to change after he has

been sworn as a juror than he was before.   Since the days of Lord Coke it has been the recognized rule of law that the juror should be indifferent before he is sworn, and it was never contemplated that the oath would add to the qualification of a juror in that respect.      The language of our statute is significant.     "If it appears that the juror is not indifferent, he shall be set aside at the trial."     The statute does not say that if he can be converted from a state of unindifference to a state of indifference by instructions of the court, and by taking an oath, he shall be qualified to act.    " The juror must stand indifferent as he stands unsworn."

The defendant was confronted at the outset with the difficulty of convincing the jurors, who had formed opinions that he was guilty so strong that it would require evidence to remove them, that their opinions were wrong, and unless he could produce new and weighty evidence he must be convicted so far as his conviction depended on those jurors.   The prisoner was thereby deprived of the universal rule of jurisprudence, founded upon evident principles of wisdom and justice, that every man charged with crime is presumed innocent until he is proved guilty.   He was assumed to be guilty, and required to prove his innocence before he could claim an acquittal—which was simply monstrous.

Because the court thought without evidence " that there was no probability that twelve jurors, qualified in other respects, would be found in the county who had not formed an opinion that the defendant was guilty," etc., it is claimed that public necessity demanded such a course.   It might as well be argued that public necessity required the poisoning of the defendant in his food, or stabbing him in his sleep.   Nothing that the worst men ever propounded has produced so much injustice, oppression, and suffering as this pretence of public necessity.   It has justly been called " the tyrant's devilish plea," and the common honesty of all mankind has branded it with everlasting infamy.   It was never before suggested in any case in this country that by reason of the difficulty of finding jurors who had not formed an opinion, or for any other cause, it was necessary to put upon the jury persons who had formed opinions of the guilt of the accused so strong that it would require evidence to change them.

The law confers no authority upon the court to dispense with the statute qualifications of a juror, even if it should affirmatively appear that every man in the county was disqualified to act as a juror.   Chief Justice *Parker*, in *State* v. *Howard, supra*, says that if the prisoner has not had a fair trial, it is not a matter for the court to consider if sending the case to a new trial, and rejecting all persons who had formed an opinion, would be, in other words, discharging the defendant.   When it is once conceded that the defendant is entitled to an impartial jury, everybody understands what that means; common sense at once settles that question. No rule of law is necessary to determine its meaning; and no rule

of law can change it, because no rule of law would be right which the whole world would regard with detestation.

The administration of justice is at all times deemed a matter of high importance; but when the life of a human being is involved, it assumes an importance inferior to no other question which can be submitted to the decision of men. In our government the trial by an impartial jury is justly deemed an element of the highest importance. It has been denominated, in no language of fiction, the palladium of our liberties, and the noblest institution ever invented by man.

The importance of selecting jurors duly qualified cannot be over-estimated, for upon it depends the security of the whole community, as well as the safety of the individual citizen when unjustly accused of crime.

*D. Barnard*, attorney-general, and *J. Kivel*, solicitor, for the state.

CARPENTER, J. Whether the rule of the telegraph company is a reasonable one, and whether the court might properly have compelled the witness to produce the telegrams without making the order required by the rule, are questions that need not be considered. *Hall* v. *Young*, 37 N. H. 134, 142. The method of procuring the telegrams did not concern the defendant. It was immaterial to him whether the witness produced them voluntarily in compliance with a rule of the company, or involuntarily under an order of court made in defiance of the rule.

The telegrams were properly received in evidence. They were sufficiently identified. They were competent for the jury to consider, in connection with other evidence, as tending to show that Hiram was in Rochester February 5, and why he went there. The defendant's telegram No. 3 was evidence of his receipt of telegram No. 2.

Whether Marion Sawtelle was a competent witness was a question of fact. The finding of the court was made upon competent and sufficient evidence, and is not revisable. *Carlton* v. *Carlton*, 40 N. H. 14, 18–20; *Day* v. *Day*, 56 N. H. 316; *Free* v. *Buckingham*, 59 N. H. 219, 226.

The testimony of Pierce that the place where Hiram's body was found was in a solitary, unfrequented neighborhood, and of Dunnell that five days after the homicide he observed horse and wagon tracks at the place where it was committed, was not incompetent. An objection to evidence on the ground of remoteness raises no question of law, but one of fact, to the determination of which at the trial term no exception lies. *State* v. *Boston & Maine Railroad*, 58 N. H. 410; *Morrill* v. *Warner*, 66 N. H., *post.*

No error of law was committed by the denial of the defendant's motion that the state be required to elect on which count the trial should be had. *State* v. *Marvin*, 35 N. H. 22, 26; *State* v. *Lin-*

*coln*, 49 N. H. 464, 471 ; *Com.* v. *Hills*, 10 Cush. 530 ; *Com.* v. *Slate*, 11 Gray 60 ; *Com.* v. *Sullivan*, 104 Mass. 552 ; 1 Chit. Cr. L. 253.

The defendant took no exception to the impanelling of the jurors whose competency is now questioned, and by not excepting waived all objection to them. *Temple* v. *Sumner*, Smith (N. H.) 226, 233 ; *Rollins* v. *Ames*, 2 N. H. 349, 351 ; *State* v. *Hascall*, 6 N. H. 352, 360 ; *State* v. *Rand*, 33 N. H. 216 ; *State* v. *Flanders*, 38 N. H. 324. But the trial court, of its own motion and without the suggestion of either party, may, if it think fit, reserve a question of law for consideration at the law term. G. L., *c.* 208, *ss.* 5, 11 ; *Steele* v. *Bates*, 2 Aik. 338.

" It is essential to the preservation of the rights of every individual, his life, liberty, property, and character, that there be an impartial interpretation of the laws and administration of justice. It is the right of every citizen to be tried by judges as impartial as the lot of humanity will admit." Bill of Rights, *art.* 35. The guaranty applies to jurors as well as judges. *Temple* v. *Sumner*, Smith (N. H.) 226, 227 ; *State* v. *Webster*, 13 N. H. 491, 492. It is an affirmation of the common law. *Sanborn* v. *Fellows*, 22 N. H. 473, 486 ; *Moses* v. *Julian*, 45 N. H. 52, 54, 55 ; *In re* School Law Manual, 63 N. H. 574, 576 ; *State* v. *Wilson*, 38 Conn. 126, 137 ; *Spies* v. *Illinois*, 123 U. S. 131, 169, 170 ; Cool. Con. Lim. (4th ed.) 395. It presupposes that unqualified disinterestedness may be impossible of attainment. *Com.* v. *Worcester*, 3 Pick. 462, 471, 472. The framers of the constitution did not intend that private right should be incapable of vindication, or that crime should go unpunished, whenever under the frame of government by them ordained an absolutely indifferent tribunal for the enforcement of law could not be obtained. "A minute theoretic and remote interest arising from a possible participation in penalties either payable to the town, county, or state, does not disqualify one from acting as a judge, when all are so interested who can act, and when the law would remain unexecuted without it." *Com.* v. *Emery*, 11 Cush. 406, 411. Nor does such an interest in a like case disqualify a juror. *Com.* v. *Ryan*, 5 Mass. 90, 92 ; *Moses* v. *Julian*, 45 N. H. 52, 55. An act providing that " in indictments and penal actions for the recovery of any sum of money or other thing forfeited, it shall not be a cause of challenge to any juror that he is liable to pay taxes in any county or town which may be benefited by such recovery," is not a violation of the Massachusetts declaration of rights assuring to every citizen " the right to be tried by judges as free, impartial, and independent as the lot of humanity will admit." *Com.* v. *Reed*, 1 Gray 472.

In Vermont a justice of the peace may properly try and convict a defendant, and impose on him a fine payable to the town of which the justice is a rated inhabitant, notwithstanding a provision of the statute that " no justice of the peace shall take cognizance of

any cause where he shall be directly or indirectly interested in the cause or matter to be tried." *State* v. *Batchelder*, 6 Vt. 479. The court say (*p.* 486),—"Nothing is more true in theory than that every judge and justice who tries a cause should not have the slightest interest in its determination, and nothing more true in fact and in practice than that, as it respects state cases in general, there is no such judge or justice in Vermont. Still criminal justice must be administered. Every magistrate like other citizens is a stockholder as it respects the funds of the state, and subject to proportional loss or gain by public prosecutions. Yet this trifling state interest in effect is just nothing." On the same ground it is held that a juror is not disqualified by a like interest, though the constitution secures a trial "by an impartial jury." *Middletown* v. *Ames*, 7 Vt. 166, 168, 169.

"In actions for the recovery of any penalty before a justice, it shall be no cause of exception that such justice resides or has property within the town in which the offence was committed, nor that the penalty or any part thereof may belong to such town." G. L., *c.* 266, *s.* 8. This act has been in force since 1843 (Rev. Stats., *c.* 211, *s.* 6), and its validity has never been questioned. Nearly all the fines imposed by police courts are payable to the towns where the courts are held and in which the justices reside. G. L., *c.* 268, *s.* 7. Objection for this cause to the justice's jurisdiction has never been taken.

In *M. J. J.* v. *J. C. B.*, 47 N. H. 362, 368, it was held that a justice of the peace is not disabled by his interest as a citizen and taxpayer of the county from trying a bastardy case, at the complaint of a county pauper, on the ground that his interest is "too remote and minute to disqualify him," and "to deny his authority to act in such a case might . . . leave the law unexecuted." Whether in such case a justice resident in an interested town would be disqualified because "it would be easy to obtain a disinterested magistrate from some town in the vicinity" (47 N. H. 369) has not been determined. *Warren* v. *Glynn*, 37 N. H. 340; *Gilmanton* v. *Ham*, 38 N. H. 108; *Hoit* v. *Cooper*, 41 N. H. 111, 115.

Although "the smallest pecuniary interest in the result of a cause disqualifies a juror" (*Page* v. *Railroad*, 21 N. H. 438), jurors constantly sit in the trial of offenders punishable by fine payable to the county. Exception to them on the ground that as taxpayers resident in the county they are interested in the result, has, it is believed, never been taken. If the objection were tenable, the administration of the law would in such cases be impossible. No offender punishable by fine, or even by imprisonment in jail, could be convicted. The state cannot have a change of venue except in the extraordinary case of a general insurrection. Unless the defendant asks for a change of venue (*State* v. *Albee*, 61 N. H. 423), he cannot be tried "in any other county than that in which" the offence was committed. Bill of Rights, *art.* 17.

"During the earliest ages of our judicial history juries were selected for the very reasons which would now argue their unfitness, *videlicet*, their personal acquaintance with the parties and the merits of the cause; and few rules of law were enforced with greater strictness than those which required that the *venue*, *visne*, or *vicinetum*, in other words the neighbourhood whence the juries were to be summoned, should be also that in which the cause of action had arisen; in order that the jury who were to determine it principally from their own private knowledge, and who were liable to be *attainted* if they delivered a wrong verdict, might be persons likely to be acquainted with the nature of the transaction they were called upon to try. . . . In order to effect this end the parties litigant were required to state in their pleadings with the utmost certainty, not merely the county, but the very *venue*, *i. e.*, the very district, *hundred*, or *vill* within that county where the facts that they alleged had taken place, in order that the sheriff might be directed to summon the jury from the proper neighbourhood in case issue should be taken on any of such allegations. . . . Anciently, the jury, in order that they might be persons well acquainted with the controversy, were summoned out of the very *hundred* designated for the *venue*. Afterwards the rule was relaxed, and in the reign of Edward the Third it was sufficient if the jury contained *six* hundreders. Gilb. C. P., *c.* 8. This number was in Henry the Sixth's reign reduced to *four*. Fort. de Laud., *c.* 25. It was afterwards, by *stat.* 35, Hen. 8, *c.* 6, restored to *six; stat.* 27 Eliz., *c.* 6, reduced it to *two ;* and so the law remained till long after the *stat.* 16 and 17 Car. 2, *c.* 8, after which act it was still necessary that *two* at least of the jurors should be summoned from the *hundred* laid in the declaration; and if there were not so many it was cause of challenge. But this last remnant of the ancient strictness was abolished by 4 and 5 Anne, *c.* 6 [A. D. 1706–7], except so far as concerned actions founded upon penal statutes, to which the abolition was extended by 24 G. 2, *c.* 18 [A. D. 1751]. So that now it is in all cases sufficient if the jury be summoned *de corpore comitatus, i. e.*, from the body of the county in which the *venue* is laid by the declaration." 1 Smith Lead. Cas. 363, 365.

" *Vicinetum* is derived of this word *vicinus*, and signifieth neighbourhood, or a place neere at hand, or a neighbour place. And the reason wherefore the jury must be of the neighbourhood is for that *vicinus facta vicini præsumitur scire ;* all which is implied in this word." Co. Lit. 158 b ; Bac. Abr., Juries E., 4. " By the policy of the ancient law the jury was to come *de vicineto*, from the neighbourhood of the vill or place where the cause of action was laid in the declaration ; and therefore some of the jury were obliged to be returned from the hundred in which such vill lay, and if none were returned the array might be challenged for defect of hundredors. . . . For living in the neighbourhood

they were properly the very country or *pais* to which both parties had appealed, and were supposed to know beforehand the characters of the parties and witnesses, and therefore they better knew what credit to give to the facts alleged in evidence. But this convenience was overbalanced by another very natural and almost unavoidable inconvenience, that jurors coming out of the immediate neighbourhood would be apt to intermix their prejudices and partialities in the trial of right." 3 Bl. Com. 359, 360; 1 Stark. Ev. 22. It was because of this inconvenience, says Blackstone, that the law requiring jurors to come from the particular vicinage, and that some of them should be hundredors, was finally repealed.

Knowledge of the facts upon which the issue to be tried depended, and the necessarily consequent impression or opinion on the merits, so far from being an objection to a juror, were a desirable qualification. Until 1706 a presumed knowledge in at least two of the twelve was essential. The only reason for requiring hundredors to be of the jury was because of their supposed better knowledge of the facts. If, after the juror was summoned and before he was sworn, he removed from or alienated his lands in the hundred, he was not for that reason liable to challenge, because by his removal or by his alienation of his land his "knowledge cannot be divested out of his person." 21 H. 6, 39. pl. 4; 14 H. 7, 2, pl. 6; Fitzh. Abr., Chall., 68; Bro. Abr., Chall., 65, 71; Dyer 316, b. If the issue was parcel or not parcel of a manor, or upon a custom of the manor, the jury should come of the manor because they best know the extent of the manor and its customs. *Moore* v. *Goodgame*, Cro. Jac. 327; *Symonds* v. *Burlow*, Cro. Jac. 405; Tri. per P. (8th ed.) 135; 6 Co. 14, b.

In assize the recovery was often had *per visum juratorum.* Co. Lit. 158 b; 1 Reeve Eng. Law 326, 327. If in a subsequent real action a former recovery was pleaded, and the plaintiff replied that the land in issue was not the same or parcel of the same lands, the question was tried by the jurors of the first trial, or by such of them as were living and could be obtained, impanelled with others. Tri. per P. (8th ed.) 96, 97; 21 Vin. Abr. 71–73; 1 Burr. 252–258. They who tried the first issue—viewed the land and examined the bounds—were better qualified than strangers could be upon testimony laid before them to determine whether the land sued for in the second action was the same or a part of the same land, if they had no motive to favor either party. If a juror had such motive, as if he were interested in the result of the second action, he was rejected and a stranger called in his place. 4 H. 6, 28, pl. 12. In a writ of right, the four knights summoned to select the jurors were sworn "to choose twelve knights girt with swords of themselves and others which best know and will declare the truth between the parties." 22 E. 3, 17 and 18; 7 H. 4, 20, pl. 28; *Tyssen* v. *Clarke*, 3 Wils. 541, 560. "Less than a hundred years ago in

England it was usual to try mercantile cases before a special jury, who spoke to the custom of merchants of their own knowledge." 7 Am. Law Rev. 658; *Carvick* v. *Vickery*, Doug. 653, 654 n.

A jury was summoned for the trial of each cause, and each of several issues in the same cause, if taken upon matters arising in different counties—as if, for example, in a real action by two coparceners the defendant pleads title to one, and to the other a release made in another county, or in trespass *de bonis* if the defendant justifies the taking of parcel in one county and parcel in another county. 10 H. 6, 9 and 10, pl. 35; 33 H. 6, 55, pl. 47; Fitzh. Abr., Judgment, 13, 39; Bro. Abr., Damages, 135, Costs, 3; 1 Smith Lead. Cas. 364. Although by the words of the writ of *venire facias* the sheriff was commanded to return twelve jurors only, "yet by ancient course the sherife must return 24; and this is for expedition of justice; for if 12 should onely be returned, no man should have a full jury appear or be sworn in respect of challenges, without a *tales*, which should be a great delay of tryals." Co. Lit. 155 a. By reason of "the partiality found among them, neighbours having generally a particular attachment to one party more than another" (Bac. Abr., Juries E., 4), kinship, personal enmities, and various other disqualifications (Co. Lit. 156 a–158 b, 3 Bl. Com. 358–365), this number was often found insufficient, and it became necessary to summon other jurors, called the *tales*, to make up the deficiency. 3 Bl. Com. 365, note 8. This caused delay and expense. As long as so few jurors were summoned, and they were required to come from the immediate neighbourhood where the facts occurred upon which issue was taken, and where generally the parties and their witnesses resided, it was essential to the due administration of justice that a juror should not be set aside unless, upon objection taken, he was found to be legally disqualified. Hence it is that nearly all the very numerous decisions on the subject in civil cases were made before the statute of 3 Geo. 2, c. 25 (1730). That act required that not less than forty-eight nor more than seventy-two jurors should be returned from the body of the county for the trial of all issues at the same assizes, and that from them the jurors for the trial of each cause should be selected by lot. 21 Vin. Abr. 213–216; Bac. Abr., Juries, B, 2, 3, and 6, and F.; Tri. per P. (8th ed.) 146–163. It had no application to criminal cases.

As counsel suggest, it is by examination of the ancient rather than the modern books that the common law of disqualification of jurors and of challenge is best determined, and the old cases cited from the Year Books and other reports have therefore been examined.

Challenges, *propter affectum*, were of two kinds, (1) for principal cause and (2) to the favor. A challenge is called principal "because if it be found true it standeth sufficient of itselfe with-

out leaving anything to the conscience or discretion of the triors."
Co. Lit. 156, b.   It is "the naming of some exception which
being found true the law presently allows."   Term. de la L.,
Challenge; *Temple* v. *Sumner*, Smith (N. H.) 226, 228; *State* v.
*Howard*, 17 N. H. 171, 191.   It admits of no answer, counter-
plea, or qualification.   If it be for kindred, it is immaterial that
the juror is also of kin, though in a nearer degree, to the other
party, or that, notwithstanding the kinship, the triers find him to
be in fact indifferent.   7 E. 4, 4, pl. 12;   Bro. Abr., Chall., 167;
Co. Lit. 157 a; *Hunsdon* v. *Baker*, Cro. Eliz. 663; 21 Vin. Abr.
237, 238.   No evidence is heard or considered, except such as
tends to show the existence or non-existence of the particular fact
alleged as the ground of the challenge.   The triers are sworn to
well and truly try, whether the juror is a cousin, servant, or ten-
ant, etc., as the case may be, of the party.   *Barrett* v. *Long*, 3 H.
L. Cas. 395, 400;   *Rex* v. *Dolby*, 1 Car. & K. 238.   A fact which,
if established, was not in judgment of law inconsistent with indif-
ference—which admitted of qualification and might be explained
away by other evidence—was never a ground of principal chal-
lenge.

Challenge to the favor "is when the party alledges any such
exception against one or more of the jurors, which is not forth-
with sufficient upon acknowledgement of the truth thereof, but
rather arbitrable and considerable by the rest of the jurors; as if
the son of the juror had married the daughter of the adverse
party."   Term. de la L., Challenge.   It "sheweth causes of favour
which must be left to the conscience and discretion of the triors
upon hearing their evidence to find him favourable or not favour-
able."   Co. Lit. 157 b;   *Temple* v. *Sumner* and *State* v. *Howard*,
*supra*.   It raises no question of law, but the question of fact
whether the juror stands indifferent between the parties.   " The
causes of favour are infinite."   Co. Lit. 157 b.   In this form of
challenge, probable circumstances of suspicion, such as great
intimacy with one party, or strife and quarrels with the other—
any acts or sayings indicating affection for one or malevolence
toward the other—in short, anything tending to show a motive on
the part of the juror to favor one party or to wrong the other,
may be alleged and proved.   Evidence in rebuttal of the allega-
tions, or qualifying and explaining them, may be adduced by the
opposite party, and upon the whole evidence it is to be found
whether the juror "stands indifferent as he stands unsworn."   The
triers are sworn "to well and truly try whether the juror stands
indifferent between the parties, and thereof a true verdict give
according to the evidence."   26 How. St. Tr. 1227; 1 Salk. 152;
Joy Chall. 222.

"When any challenge is made to the polls, two triors shall bee
appointed by the court, and if they trie one indifferent and he be
sworne, then he and the two triors shall try another; and if another

be tried indifferent and he be sworne, then the two triors cease and the two that be sworne on the jury shall try the rest." Co. Lit. 158 a. To triers, if demanded, the parties were legally entitled (*O'' Coigly's Case,* 26 How. St. Tr. 1218–1226; *Edmonds's Case,* 1 St. Tr. N. S. 792 n.); but the facts alleged as principal cause were often not in dispute. By consent challenges in both forms were sometimes tried by the court. A neglect to ask for triers was apparently deemed such consent. Objections going to the favor only were not unfrequently submitted to, and the juror withdrawn without a trial. 21 Vin. Abr. 279, pl. 6; 9 How. St. Tr. 8–11; 9 How. St. Tr. 1057–1061; 13 How. St. Tr. 1108; 16 How. St. Tr. 136–138; 18 How. St. Tr. 1233; 22 How. St. Tr. 1039; 26 How. St. Tr. 1223; 31 How. St. Tr. 1172, 1173; 1 St. Tr. N. S. 1034; Joy Chall. 191–193; 2 Rolle Abr. 660.

The common law on this subject as upon all others is natural law. It recognizes the weaknesses of mankind—the effect of blood, affection, interest, malice, ill-will, or other motive upon their discernment of right and wrong, and eliminates them so far as " the lot of humanity will admit " from its judgments. It permits no one who from any cause has a motive or inducement to favor one party or wrong the other to sit in judgment upon their rights. It "has so watchful an eye to the pure and unbiased administration of justice that it will never trust the passions of mankind in the decision of any matter of right." *Hesketh* v. *Braddock,* 3 Burr. 1847, 1856. "I know this," said Sir John *Scott* (subsequently Lord *Eldon*), attorney-general in *O' Coigly's Case,* 26 How. St. Tr. 1223, " that we live in a country whose government and constitution is not worth supporting if it be possible that any trial of men for their lives can be conducted with the concurrence of those to whom is intrusted the administration of justice under circumstances that shall leave upon the mind of any honest man a doubt whether the prisoners tried for their lives have been justly tried or not."

In ancient times the law esteemed those who being without motive to favor either party had immediate and personal knowledge of the facts in dispute, to form the best conceivable tribunal for the determination of the issue. It held that twelve perfectly impartial witnesses of a transaction were better qualified and more likely to find the truth than twelve strangers would be upon information conveyed to them by testimony. Until the introduction (about 1650, *Bright* v. *Eynon,* 1 Burr. 390, 393, 394) of the practice of granting new trials where verdicts were returned against the evidence, they not only might but were required to determine the cause in the absence of other evidence, upon their own personal knowledge. *Bushell's Case,* Vaugh. 148, 149; 3 Bl. Com. 374. But if they should give their verdict upon their own private knowledge, it could never be known whether the verdict was according to or against the evidence. "And therefore, together

with new trials, the practice seems to have been first introduced, which now universally obtains, that if a juror knows anything of the matter in issue, he may be sworn as a witness and give his evidence publicly in court." 3 Bl. Com. 375. To this extent only has the ancient doctrine been modified. 1 Stark. Ev. 405, 449; 1 Phil. Ev. 7; Rosc. Crim. Ev. 129, 192; 1 Arch. Cr. Pr. & Pl. 150; 1 Chit. Cr. L. 607, 608; 2 Hale P. C. 306; Bac. Abr., Ev. A., 2; 7 Mod. 2; 1 Salk. 405; 6 How. St. Tr. 1012 *n;* *Reading's Case,* 7 How. St. Tr. 259, 267; *Kirwan's Case,* 31 How. St. Tr. 543, 807; *Rex* v. *Rosser,* 7 C. & P. 648; *Parks* v. *Boston,* 15 Pick. 198, 209–211; *Patterson* v. *Boston,* 20 Pick. 159, 166; *Murdock* v. *Sumner,* 22 Pick. 156, 157; *Schmidt* v. *Insurance Co.,* 1 Gray 529, 535, 536; *M'Kain* v. *Love,* 2 Hill Eq. 506; *Bell* v. *State,* 44 Ala. 393. In *Dunbar* v. *Parks,* 2 Tyler 217 (1802), after the evidence was closed and before argument, a juror stated to the court that he knew some matters relating to the cause, and inquired whether it would be proper for him to communicate his knowledge to his brethren of the panel after they were charged; and thereupon, by direction of the court, he was sworn, and standing in the jury-box testified to a material fact. "It is a common occurrence both in civil and criminal causes to see jurors on the panel called as witnesses to prove some material facts in their knowledge relating to the matter in question." *State* v. *Spencer,* 21 N. J. Law 196, 198, 199 (1846). On the question of a juror's competency, no sound distinction can be drawn between his knowledge of one fact and his knowledge of all facts material to the issue. It cannot be foretold that the one fact which he happens to know, however remote and unimportant it may seem to be, may not be the fact upon the existence or non-existence of which the verdict will turn. *Metcalf* v. *Gilmore,* 63 N. H. 174, 187, 188. His qualification to act as a juror is not affected by his making oath to the fact in open court.

The common law esteems jurors indifferent who have no motive to find for or against either party. All the valid objections to their competency, *propter affectum,* whether for principal cause or for favor, rest on a motive presumed by law, or proved as a fact, to find for one or the other party. "The law presumeth that one kinsman doth favour another before a stranger." Co. Lit. 157 a. It presumes that the servant will be moved to favor his master under whose command he is (21 E. 4, 67, pl. 52; Bro. Abr., Chall., 183), and a tenant his landlord who may distrain upon him. One of the reasons for requiring a juror to have an estate of freehold was the motive, the incentive, it afforded to find the issue truly. If upon attaint his verdict was found to be false, among other penalties his lands and tenements might be seized by the king. Tri. per P. (8th ed.) 270, 271; Co. Lit. 294 b. Hence a juror who, after he was summoned and before he was sworn, parted with his freehold was disqualified; "for his feare to offend and to have lands wasted,

&c., which is one of the reasons of law, is taken away." Co. Lit. 157 a.

In a suit for conspiracy the defendants' challenge of the jurors, for that in an indictment for the same conspiracy they had found the defendants guilty, was disallowed, because this "did not show that there was ill-will between the jurors and them; for the jurors acted upon their oath." 27 Ass. 13; Fitzh. Abr., Chall., 137; Bro. Abr., Chall., 120. In an action against two, it was no ground of principal challenge that the juror with others had already found the other defendant guilty and assessed damages for which the challenger if found guilty would be charged. 29 Ass. 3; Fitzh. Abr., Chall., 145; Bro. Abr., Chall., 132. So if one of the defendants, A, pleaded soil and freehold, and the other, B, pleaded that the soil and freehold were in A, and justified as his servant, it was not a principal challenge for B that the same jurors at a former term tried the issue between the plaintiff and A, and found against A. 18 E. 4, 12, pl. 8; Bro. Abr., Chall., 175. An arbitrator who was jointly selected by both parties, and fully heard them upon the matter put in issue by their pleadings, could not be challenged for principal cause by either; but if chosen by one party to act with one chosen by the other he was challengeable, because "this election makes him in a manner a party and counsel for him on whose part he is chosen." 3 H. 6, 24, pl. 3; 20 H. 6, 40, pl. 9; 9 E. 4, 46, pl. 34; Fitzh. Abr., Chall., 37, 57; Bro. Abr., Chall., 7, 85; Co. Lit. 157 b. It was not principal cause that a juror was chosen by the other party commissioner for the examination of witnesses in the same case, for he is made commissioner by the king under the great seal, and is "presumed in law to be indifferent" (9 Co. 71 a, Co. Lit. 157 b); nor that on the preceding day the juror had found for the plaintiff upon another issue in the same cause, "for a man shall not be challenged for that he said the truth." 9 E. 4, 16, pl. 15; Fitzh. Abr., Chall., 55; Bro. Abr., Chall., 83. But it is a principal challenge "if the juror hath given a verdict for the same cause albeit it be reversed by writ of error, or if after verdict judgment were arrested. So if hee hath given a former verdict upon the same title or matter, though betweene other persons." Co. Lit. 157 b, and authorities cited. This was not because he had formed and expressed an opinion upon the merits. If the second trial of the issue was upon the same evidence, he would have a strong motive to find as he did before. One of two opposite verdicts on the same issue and evidence must be wrong, and it might as well be, and was perhaps as likely to be, the last as the first. For a verdict found false upon attaint he was liable to heavy penalties. Tri. per P. (8th ed.) 270, 271; 3 Bl. Com. 402–405. A sufficient and perhaps better reason was, that he had under the solemn sanction of his oath officially heard the evidence and determined the issue. The law presumed that he would not by his second verdict confess that in the former he was forsworn, as in attaint it

was presumed that the son of one of the petit twelve who was dead would not "say contrary to the oath of his father." 34 Ass. 6 ; Fitzh. Abr., Chall., 127 ; Bro. Abr., Chall., 140.

At common law as well as by the statute 25 E. 3 it was a good challenge that the juror with others found an indictment against a party for " treason, felony, misprision, trespasse, or the like in the same cause." Co. Lit. 157 b ; *Colledge's Case*, 8 How. St. Tr. 550, 588 ; 2 Reeve Eng. Law 459, 460. The law presumed that " all who indicted him still bore the same ill-will against him." 2 Reeve Eng. Law 268 ; Mir. Just., *c.* 3, *s.* 34.

Actions pending between the party and a juror of such a nature as to imply malice or ill-will, as trespass for assault and battery, were causes of principal challenge. Other actions not implying malice, as debt, went only to the favor (Co. Lit. 157 b, and cases cited ; 21 Vin. Abr. 269, 270), for " if a man demands his debt of his debtor, it cannot be intended. that he has ill-will against him." 11 H. 4, 26, pl. 50 ; Fitzh. Abr., Chall., 87. That a juror was a tenant of a party, and " within his distress," *i. e.*, liable to be distrained for rent or other dues, was a principal challenge ; but if not liable to distraint, as if he held upon a rent-seck, or if the party was within the distress of the juror, the challenge was to the favor. Co. Lit. 157 a, and cases cited ; 21 Vin. Abr. 257–260 ; Tri. per P. (8th ed.) 187.

In the *Regicides' Case*, 5 How. St. Tr. 975 (A. D. 1660), it was resolved by all the judges " that if several persons be indicted together in one indictment for one crime, in case some of them be found guilty by one jury, and afterwards some of the same jury be returned for trial of others in the same indictment, it is no challenge for those prisoners to say that those jurors have already given their verdict and found others guilty who are indicted in the same indictment for the same offence ; for . . . in law it is a several indictment against every one of them, and the crime is several, and one may be guilty and not another ; and the jury are to give their verdict upon particular evidence against every several person, and therefore the finding of one guilty is no argument or presumption that those jurors will find another guilty." This doctrine was not new. The resolution was in conformity with established principles of the common law. It went upon the ground that a juror who had no malice or ill-will against the prisoner, or other motive to find against him, was indifferent, and was not the less indifferent by reason of the knowledge of the facts in controversy which he obtained from the evidence produced at the other trial. The doctrine has never been questioned by the English courts. *Plunket's Case*, 8 How. St. Tr. 447, 450, 451 (A. D. 1681) ; *Cranburne's Case*, 13 How. St. Tr. 235 (1696) ; *Cook's Case*, 13 How. St. Tr. 311, 313 (1696) ; *Willis's Case*, 15 How. St. Tr. 521, 614, 615 (1710) ; *Thistlewood's Case*, 33 St. Tr. 681, 956 (1820) ; *Brunt's Case*, 33 St. Tr. 681, 1177, 1180 (1820) ; *Com.* v. *Hill*, 4 Allen 591 (1862).

If by reason of the prisoner's waiver of his peremptory challenges, or for other cause, there was no difficulty in obtaining a jury, the court often—perhaps generally—directed that the jurors of the previous trial be not called.   The *Regicides' Case,* 5 How. St. Tr. 975, 1058, 1059; *Whitebread's Case,* 7 How. St. Tr. 311, 319; *Stapleton's Case,* 8 How. St. Tr. 502; *Willis's Case,* 15 How. St. Tr. 521, 614, 615; *Turner's Case,* 32 St. Tr. 957–964.   Under like circumstances in other cases, jurors against whom no lawful objection existed were sometimes set aside at the request of the prisoner.   At the trial of Count Vratz, in 1682, as accessory before the fact to the murder of Thomas Thynn, by a jury *de medietate linguœ,* the prisoner's interpreter said to the court,—"My lord, he desires that there be none of the jury that are anything kindred or relation to Mr. Thomas Thynn, nor any particular friend of his, and he is satisfied.   *Pemberton,* C. J.: No, there shall not; we will take care of that."   The defendant requested that he might "have the names of those that are returned of the jury and a little time to consider of it.   *Pemberton,* C. J.: That we cannot do; all we can do for you is, we will take as much care as we can that you may have indifferent persons and persons of quality.   .   .   .   The interpreter: He says, my lord, he does not know who they are, but they may be persons who are touched; and may have something of evil will or spleen against him.   His father served against the King of Denmark and against the Poles and the papists, and his father was a protestant and served the protestant cause.   .   .   .   *Pemberton,* C. J.: Examine them as they come to the book if there be any of the Roman Catholic religion, and do not let any such be sworn."   9 How. St. Tr. 1, 8, 11; *Hampden's Case,* 9 How. St. Tr. 1053, 1057-1061; *Carlile's Case,* 1 St. Tr. N. S. 1034.

A juror's expression of opinion, however strong, upon the merits, statements indicating malice or ill-will, even his assertion that he would find for one of the parties, were grounds for challenge to the favor only.   When shown in evidence they were not conclusive; they were not in law necessarily inconsistent with indifference; they were subject to rebuttal, qualification, or explanation.   In a writ of estrepement, the plaintiff challenged a juror for that " he was favorable to the defendant and had promised him that he would pass for him;" wherefore he was tried by the triers, who found him favorable to the defendant, and he was withdrawn.   3 H. 6, 38 pl. 3 (1425).

In an action of replevin a juror was challenged "for that he was favorable."   *Babington,* C. J., submitting the question to the triers, charged them as follows: "Do you know, triors, what is meant by favorable?   He is favorable who, whether the matter is true or false, will pass for one or the other.   .   .   .   But if one has said twenty times that he will pass for the one or the other party, you will inquire upon your oath whether the cause is for the

affection he has for the party, or for the knowledge he has of the matter in issue ; and if it is for the affection he has for the party, then he is favorable, but otherwise he is not.   And if he has more affection for one party than for the other, yet if he has full knowledge of the matter in issue, and if he is sworn will declare the truth notwithstanding the affection he has for the party, he is not favorable."   7 H. 6, 25, pl. 8 (1429) ; Fitzh. Abr., Chall., 22 ; Bro. Abr., Chall., 55 ; 2 Rolle Abr. 655.   Neither Fitzherbert nor Brooke intimates a doubt of the law laid down by *Babington*, although they freely criticise and question many of the cases they abridged, as, for example, Fitzh. Abr., Chall., 21, 23, 33, 131, and Bro. Abr., Chall., 33, 56, 168, 181.   The case is twice cited by Coke as one of the numerous instances of challenge to the favor.   Co. Lit. 156 a [n], 157 b [b].   With his eye upon it, he enumerates among the principal causes the giving of "a verdict before for the same cause" (157 b), but does not mention the expression of an opinion on the merits, or the declaration of a purpose to find for or against a party.   He evidently understood that challenges on the latter ground went only to the favor, and that the doctrine of 7 H. 6, 25 was one of the rudiments of the law on which there could be no difference of opinion.   When this case had been accepted by English courts for four hundred years (*Rex* v. *Edmonds*, 4 B. & Ald. 471, 490-493) as a correct application of a familiar principle, an American court fell into the mistake of supposing it was not cited by Coke ; that his omission of it was due to its not being considered authority ; that it was. irreconcilable with his doctrine ; and that in *Rex* v. *Edmonds*, *Abbott*, *Bayley*, *Holroyd*, and *Best* erred in their understanding of the ancient authorities.   *People* v. *Vermilyea*, 7 Cow. 108, 124, 125, 128.

In trespass *quare clausum* the defendant justified his entry by the command of two who were seized of the land jointly with a juror, who for this cause was challenged by the plaintiff, but because the freehold could not be recovered in trespass and the juror could neither gain nor lose by the verdict, the court held that the objection went to the favor only, and submitted the question to the triers, who found the juror " egal " and not favorable.   7 H. 6, 44, pl. 23 ; Fitzh. Abr., Chall., 24 ; Bro. Abr., Chall., 57.   In attaint the defendant challenged the array for that the sheriff and one K had been arbitrators, chosen on the part of the plaintiff, of the matter, with two others selected by the defendant.   The question whether this was a principal challenge to the sheriff as it was to a juror was debated; and the decision postponed that the " justices might be advised."   But *Newton*, J., said that " though the sheriff owed all the ill and malice that he could to the plaintiff or the defendant, yet if in making the array he truly made it without showing any favor to one or the other, the array is good, and if he puts upon it a juror 'suspective et nient indifferent,' the whole

array is quashed.   And if a juror say that he will pass for the plaintiff, his saying is no cause for withdrawing him unless it is found by the triors or by the court that he said this more for favor than for the truth of the matter.   *Ad quod tota curia concordat.*"   20 H. 6, 39, 40, pl. 9 (1442); Fitzh. Abr., Chall., 37. Here so far as observed the term "indifferent" was for the first time applied to a juror, and it appears clearly by the judgment of the whole court that a juror might be found indifferent although he had formed and expressed an opinion upon the merits.

"A panel was returned in the Common Bench.   The defendant challenged the array for that it was favorably made for the party plaintiff, and prayed that it might be examined.   Then it was examined by two triors of the same inquest who were named by the judges, namely the third and the ninth in the panel.   .   .   . It was said by *Frowyk* [Ch. Justice] that no sufficient freehold is a good challenge, and of this the party himself shall be sworn whether it is sufficient or not.   Also he said that it is a good challenge that he has nothing in the hundred if the damages extend to forty marks ; or that he is more favorable to the party plaintiff than to the party defendant, for that he hath said that if he should be empanelled he would pass for the party plaintiff." 21 H. 7, 29, pl. 10 (1506).   *Frowyk* did not understand that he was overruling (7 Cow. 108, 125) the doctrine laid down by *Babington* in 7 H. 6, and by the whole court in 20 H. 6 ; nor did the editor of the edition of the Year Book printed in 1679 (or possibly the original reporter) who cites the case 7 H. 6 in the margin. The language bears no such construction.   It is merely an instance not uncommon of mentioning a ground of challenge without stating whether it is for principal cause or to favor.   Fitzherbert was at that time doubtless engaged in compiling his Abridgment, which was printed in 1514, only eight years later.   It is possible, perhaps probable, that he was present in court and heard *Frowyk's dictum*.   It is not referred to in his Abridgment—he seldom mentions mere *dicta;* but he would not be likely to omit it if he supposed it overruled or cast a doubt upon previous decisions. Brooke, who died in 1558, and whose work was published in 1568, in his abstract of the case, gives it as a *dictum* as follows : " By *Frowyk*, Justice.   Not sufficient freehold is good challenge, and of this the party himself shall be sworn if it is sufficient or not, and it is a good challenge that he has nothing in the hundred where the damages are forty marks, or to say that he has reported that if he should be empanelled he would pass for the plaintiff,— *tamen quære* of the hundred   .   .   .    for he ought to have in the hundred or dwell there in every cause of action, but where the debt or damages are forty marks, he must have forty shillings of freehold, *quod vide* in the statutes."   Bro. Abr., Chall., 90.   It is incredible that Brooke should thus criticise *Frowyk's dictum* touching the hundred, and pass without remark the discrepancy, if in

his judgment there were any, between the other *dictum* and the law laid down by *Babington*, which he (Chall. 55) had already stated.

In attaint "a juror was challenged for that he was especially laboured [by the other party] since he was sworn at the last term, and the triors found him indifferent and he was sworn. And another was challenged for that he said that if he was sworn he would pass for the plaintiff, and he was withdrawn. Another was challenged for that he was the plaintiff's servant, and it was so found. And the array of the *tales* was challenged for that the defendant offered, if the sheriff made the panel at his nomination, he should have ten marks. And the jurors who had been sworn found the *tales* not indifferently made—'nient indifferent fait.'" 21 H. 7, 32, pl. 21 (A. D. 1506). Here it is not expressly stated whether the challenge for the juror's statement was tried and the juror found not indifferent, or whether the plaintiff submitted to the objection without a trial. It not unfrequently happened in those days, as in later times, that the evidence was so clear and incapable of rebuttal that the challenge was yielded to without demanding a trial. 7 H. 6, 40, pl. 7; 27 H. 8, 26, pl. 4; 2 Rolle Abr. 660, pl. 6.

"A juror was challenged for malice that he had to the plaintiff and found indifferent, and when he came to the book to be sworn he said that notwithstanding the plaintiff had been a false harlot to him, yet he would find according to the truth. Deinshil showed this to the court, and prayed that he be tried by the triors, for his malice appeared by his words. *Fitzherbert*, J.: He has been once found indifferent, wherefore he shall not be tried again—to which the court agreed." 27 H. 8, 21, pl. 10 (1536); Bro. Abr., Chall., 4. A challenge to a juror for that he said to one of the parties, "Provide you to pay, for if I am sworn I will give my verdict against you," was considered a challenge to the favor, and submitted to triers, who found the juror not indifferent, and he was withdrawn, in *Odill* v. *Tyrrell*, 1 Bulst. 20 (1610).

In *Cook's Case*, 13 How. St. Tr. 311, 333, 334 (1696), Cook said,— "My lord, before the jury is called, I am advised that if any of the jury have said already that I am guilty, or they will find me guilty, or I shall suffer, or be hanged, or the like, they are not fit or proper men to be of the jury. L. C. J. *Treby* replied, You say right, sir, it is a good cause of challenge," meaning a good cause of challenge to the favor, to be tried by triers, or, if the parties assented, by the court. He meant, and was understood to mean, not that by the mere utterance of those words, or any of them, a juror was by intendment of law disqualified, but that the expressions disclosed such a probability of bias that they ought to be submitted to and considered by triers on the question of indifference. It was the right of the crown to demand triers, and the submission to them of the question not merely whether the juror had used those words, but whether, on the whole evidence presented, he

stood indifferent. Triers were not demanded because there was
no occasion for them. The court found (correctly or incorrectly),
not as matter of law but as matter of fact, that certain expressions,
if made by the juror, would be scandalous misbehavior—a disgrace
and dishonor to him as an avowal of a mortal hatred to the accused,
and a malicious resolution to convict him without regard to the
evidence. Upon this correct or incorrect conclusion of fact the court
ruled, in accordance with long established law (49 E. 3, 1, 49 Ass.
1, Fitzh. Abr., Chall., 100, Bro. Abr., Chall., 25), that jurors could
not be required to confess their own infamy; and the defendant
having no other evidence was forced to challenge peremptorily
those whom he suspected.

That the court understood the words were used without qualifi-
cation, and as equivalent to a declaration by the juror that regard-
less of the evidence he would find the defendant guilty, is
apparent from the discussion of the question whether he could be
asked and required to answer whether he had uttered the words as
charged. Sergeant Darnall for the defendant: " I think any
man, my lord, that comes to serve upon the jury, may be asked any
question that does not make him guilty of any offence or crime,
or liable to any punishment. Now if any of these gentlemen that
are returned upon this pannel, before the summons have declared
their opinion that the prisoner is guilty, or ought to suffer; with
submission the prisoner may ask such a question, whether he have
said so yea or no. . . . L. C. J. *Treby:* You put it too large,
brother Darnall; you may ask upon a *Voyer Dire,* whether he
have any interest in the cause; nor shall we deny you liberty to ask
whether he be fitly qualified, according to law, by having a free-
hold of sufficient value; but that you can ask a juror or a witness
every question that will not make him criminous, that is too
large; men have been asked whether they have been convicted
and pardoned for felony, or whether they have been whipped for
petty larceny; but they have not been obliged to answer; for
though their answer in the affirmative will not make them crimi-
nal, or subject them to punishment, yet they are matters of
infamy; and if it be an infamous thing, that is enough to preserve
a man from being bound to answer. . . . A juror may be chal-
lenged being an alien, or being a villain; but where the matter
apparently carries crime or shame, it should be proved; the out-
lawry should be proved, and so should the being a villain. Yet
that is no crime, though it be an ignominy. Darnall: But, my
lord, I take this to be no manner of infamy at all; there is nothing
of crime, nor nothing of reproach, but only a declaring of a man's
opinion. L. C. J. *Treby:* Truly I think otherwise. I take it to
be at least a scandalous misbehavior, and deservedly ill-spoken of,
for any man to prejudge, especially in such a heinous matter. I
think it a very shameful discovery of a man's weakness and rash-
ness, if not malice, to judge before he hears the cause, and before

the party that is accused could be tried.    But it seems by what the prisoner says that he would ask all the jurors whether they have not said that he was guilty, or that they would find him guilty, or that he should be hanged, or the like; which (presuming him innocent) is to ask whether they have not defamed and slandered him in the highest degree; and to force them to discover that they have a mortal hatred to him, and come with a malicious resolution to convict him: which, admitting they are not punishable by our law, yet are things so detestably wicked and so scandalous as are not fit to be disclosed by and against themselves.    Darnall: Pray, my lord, what is more common than for a man to say before he is summoned to be upon a jury, when he hears a fact reported concerning such a one, to say I believe he is guilty, or I am of opinion he is, and I am sure he will be hanged? and yet there is no crime in this.    L. C. J. *Treby:* Truly, brother Darnall, I know not how you may approve of such a man, but I'll assure you I do not.    I take the question not to be concerning a man's discoursing suppositively; as if upon hearing news, or a report of clear evidence, a man should say, supposing this to be true, such a man is guilty, and I should find him so if I were of his jury.    This might not be sufficient to set aside a juror. For this has been a general discourse among the subjects upon occasion of this conspiracy, and it imports that if evidence should not be true and clear he would acquit him, and so he is, as he should be, indifferent.    But if a man qualified for a juror affirm positively that such a prisoner is guilty, and that he will find him so, whatever evidence or proof be given or made to the contrary; I think that may be a misdemeanor punishable as an owning and and encouraging of falsehood, perjury, and injustice, and a contempt and scandal to the justice of the kingdom.    .    .    .    Darnall: Our objection is not because it is an offence to declare a man's opinion upon a fact reported, but because it shows he has a settled opinion against the person of his guilt, and so he is not so equal a man to try him.    L. C. J. *Treby:* And is that like an honest man and a freeholder of London (who ought to be indifferent) to come with a settled opinion against a man, when he is to be one of his jury? .    .    .    Truly I think it reflects both dishonesty and dishonour upon him, and therefore these questions ought not to be asked. The question is not whether a man (if ever such a man there were) that hath so resolved and declared shall be sworn.    No, he is not fit to serve upon a jury.    But the question is, How this shall be discovered, by his own oath, or by other proof?    I think it ought to be made appear by other proof, if true.    .    .    .    But if any man in this pannel have any particular displeasure to the prisoner, or be unindifferent, or have declared himself so, I do admonish and desire him to discover so much in general; for it is not fit, nor for the honour of the king's justice, that such a man should serve on the jury."    *Pp.* 334–338.

In reading *Cook's Case*, it is to be borne in mind that the only point adjudged was, that the jurors could not be asked or required to answer the question whether they had used the words attributed to them. The question whether preconceived opinion would disqualify a juror, in the absence of motive to find for or against either party, was not raised or considered. What Darnall called a " settled opinion " against the defendant (styled by *Parker*, C. J., a " fixed belief," " fixed determination," " fixed opinion," 17 N. H. 189, 190–192, 195), the court considered as equivalent to—synonymous with—" a malicious resolution to convict him." The case lends no color of authority for the proposition to which it is sometimes cited, that at common law a previously formed and expressed opinion upon the merits disqualifies a juror. " Had the juror . . . been regularly challenged, triors would have been appointed and witnesses would have been called to prove that he had said the prisoner was guilty and would be hung. If the testimony had stopped here, possibly the triors would have found him not indifferent, or, in other words, pronounced him disqualified from serving. But had it appeared on cross-examination, or by other witnesses, that he was totally unacquainted with the prisoner, and could have no personal ill-will towards him, and that the opinion he had expressed was founded solely on the information he had received from a neighbor, the triors would no doubt have found him indifferent." 9 Month. Law Rep. 201.

In *Layer's Case*, 16 How. St. Tr. 93, 136–138 (1722), *Barbot's Case*, 18 How. St. Tr. 1229, 1233 (1753), and *Tooke's Case*, 25 How. St. Tr. 1, 15 (1794), jurors were challenged because they had said that the prisoner ought to be hanged; that if on the jury they would hang him, or that they believed him guilty; and upon its being shown that they had so stated, they were set aside without objection or demand for triers on the part of the crown. In *O'Coigly's Case*, 26 How. St. Tr. 1191, 1218, 1226–1230 (1798), before any juryman was obtained, Plumer, for the defendants, challenged Thomas Raikes " for cause," and John Foulkes was sworn. " Mr. Plumer: Did you see Mr. Raikes at the time of the arraignment of the prisoners? Yes. Did you hear him say anything respecting the prisoners at that time? He . . . inquired the names of the prisoners separately: . . . he looked them all steadfastly in the face quite close to them, clenched his fist, and exclaimed ' Damned rascals.' Atty. Gen. [Sir John Scott] : . . . That is no cause of challenge. Mr. Plumer: There can be no doubt, if the fact is believed, it proves that Mr. Raikes does not come here with that indifferent mind which every person who sits upon the life of a person ought to have. . . . Atty. Gen.: We are getting here into prodigious irregularity, and I feel it my duty to protect the gentlemen of the jury against this sort of attack. If my friend means to state any case of fact which he has to propose to the court, let him state that case,

and let us have it tried by triors. Mr. Dallas [for the defendants]: It is not only expressive of malice, but it furnishes a presumption that the juror has formed an opinion with respect to the particular case. Atty. Gen.: I must interrupt this mode of proceeding. Mr. Justice *Buller:* Will you have it tried? Dallas: Yes, we will have it tried." Thereupon the court appointed two of the bystanders (not of the jury) triers. The witness Foulkes was again sworn, and testified in chief in substance as before. The attorney-general cross-examined him at length, and in rebuttal called Sir John Mitford, who testified that Mr. Raikes had expressed to him an extreme unwillingness to be upon the jury, stated the extreme inconvenience it would be to him, and that he had applied to the court to be excused. *Buller*, J., said to the triers: "Gentlemen, you will say upon the evidence you have heard whether you are of opinion that Mr. Raikes is a person who will try these prisoners indifferently, upon the evidence that may be given, or not." After consulting together, one of the triers said, "As the oath is taken against Mr. Raikes, we think he had better be omitted." After two jurymen were obtained, the defendants challenged J. Martyr for cause. *Buller*, J., directed the two already sworn as jurors to be sworn as triers. Benj. Rawson testified: "I heard him [Martyr] say that he was afraid the prisoners were guilty, and something more he said, I do not recollect what, but he ended it by saying, I hope they will be hanged if they are guilty." While the witness was being cross-examined, the defendants abandoned their challenge.

In *Sheridan's Case*, 31 How. St. Tr. 543, 634–637 (1812), a juror was challenged as bearing malice against the defendant, and not indifferent. Triers were appointed on the demand of the crown. The defendant offered but was not permitted to prove by the juror himself that he was an Orangeman, and as such had "taken an oath hostile to the Catholics of Ireland," and having no other evidence withdrew the challenge, and the juror was sworn.

In the case of *Tutchin*, tried for libel, 14 How. St. Tr. 1095, 1100 (1704), E. P., being called, said, "My lord, I desire I may be excused. I do not know Mr. Tutchin, for I never saw him in my life; but I have read his observators, and have several times publicly disallowed them; and therefore some may think I am prejudiced against him. . . . L. C. J. *Holt:* You must not be excused unless the queen's counsel will. Mr. Montague: We challenge him on behalf of the defendant. Atty. Gen. [Sir E. Northy]: Shew your cause. Mr. Montague: My lord, our cause is, that he himself looks upon himself as not indifferent. L. C. J. *Holt:* He says he has read some of the papers, and has publicly condemned them, . . . but he does not know the author. Mr. Whitaker [for the defendant]: But he said he did not doubt but he was the author of them. Serj. Darnel [for

the crown]: He is the fitter man for a jury. . . . Mr. Montague: My lord, the matter we are contending for is, that one that is not altogether an indifferent person should not be on the jury. Atty. Gen.: The question is not whether the papers are criminal, but whether the defendant is the author of the papers; and if this gentleman knows him to be the author of them, he is proper to be on the jury. For the jury are by law to be of the neighbourhood of the place where the fact is alleged to be done, because they are presumed to know what is done there. And if this be cause of challenge you may challenge all people, and so there could be no trial. L. C. J. *Holt:* He cannot be challenged unless he has given his verdict before. Sol. Gen. [Sir S. Harcourt]: My lord, we can have no jury the way we are going. A juryman is not to be asked what his opinion of the cause is. . . . L. C. J. *Holt:* It is not a challenge. Mr. Montague: Surely, my lord, he is not so indifferent as he ought to be. He says he has already declared his opinion publicly concerning Mr. Tutchin's papers. . . . L. C. J. *Holt:* Draw up your challenge in form, and it shall be considered. . . . I will have it done, that it may remain a decision *in perpetuam rei memoriam.* But if you that are for the defendant will waive it, you may. . . . Sol. Gen.: Is it a principal, or to the favor? L. C. J. *Holt:* A principal challenge, if any. . . . He makes it as a principal challenge, . . . it must be a principal challenge, or nothing; for there can be no challenge to favor in the case of the crown." That the juror was finally excused by consent detracts little from the weight of the judgment. The jury were to pass, not upon the question whether the papers were or were not libelous—that was a question of law—but on the single question whether the defendant was the author of them; and Lord *Holt* held that the juror's understanding or opinion that he was the author was no objection to his serving. The precise extent and limitations of the doctrine that against the crown a juror could not be challenged for favor are not clear. Co. Lit. 156 a, and Hargrave's notes, 4 and 5; 2 Hawk. P. C., *c.* 43, *s.* 32; Tri. per P. 203; 1 Chit. Cr. L. 539; *Hampden's Case,* 9 How. St. Tr. 1053, 1057–1061; *Parkyns's Case,* 13 How. St. Tr. 75; *Rowan's Case,* 22 How. St. Tr. 1033, 1037; *Muir's Case,* 23 How. St. Tr. 117, 133, 134; *Despard's Case,* 28 How. St. Tr. 346, 356, 357; *Edmonds's Case,* 1 St. Tr. N. S. 785, 916—*S. C.,* 6 E. C. L. 498, 499. But it is not material whether the holding that the challenge was " a principal challenge, if any " was correct or not, the only ground of that judgment being that a challenge to the favor could not be taken against the king.

In *Edmonds's Case,* 1 St. Tr. N. S. 785, 792 (1821), upon objection by the crown the court refused to permit special jurymen to be asked whether they had expressed any opinion upon the case. The question was put to common jurymen or talesmen without, so far as appears, objection on the part of the crown. In the course

of the argument of a motion for a new trial (before *Abbott*, C. J., *Bayley*, *Holroyd*, and *Best*, JJ.), *Best*, J., said (*pp.* 887, 888) " Partiality to the prosecutor or enmity to the prisoner is the ground upon which a challenge is allowed. . . . You will find if a juror says he will give a verdict in a particular way, and that he will do this for affection for either party, he is to be challenged. . . . The question is, whether what he said was from a knowledge he had, or from favour to one party more than to the other. If a man merely expresses his horror at a statement of facts, it does not prove him to be a person disqualified from attending upon a trial." The opinion of the whole court (after taking time to consider) was pronounced by *Abbott*, C. J., who said, among other things (*pp.* 921-924),— " The last ground of the motion for a new trial was the refusal of what has been called a challenge to the polls in the case of the special jurymen. This challenge was made on the ground of opinions supposed to have been expressed by those gentlemen hostile to the defendants and their cause. There was no offer to prove such an expression by any extrinsic evidence, but it was proposed to obtain the proof by questions put to the jurymen themselves. The lord chief baron refused to allow such questions to be answered ; and in our opinion he was right in this refusal. It is true, indeed, that he permitted similar questions to be answered by the talesmen ; but in so doing we think he acted under a mistake. It does not appear distinctly in what precise form the question was propounded ; but in order to make the answer available to any purpose, if it could have been received, it must have been calculated to show an expression of hostility to the defendants, or some of them,—a preconceived opinion of their personal guilt, or a determination to find them guilty : anything short of this would have been altogether irrelevant. The language of Mr. Sergeant Hawkins upon this subject, *lib.* 2, *c.* 43, *s.* 28, is, that if the juryman ' hath declared his opinion beforehand that the party is guilty, or will be hanged, or the like, yet if it shall appear that the juror hath made such declaration from his knowledge of the cause and not out of any ill-will to the party, it is no cause of challenge.' So that, in the opinion of this learned writer, the declaration of a juryman will not be a good cause of challenge unless it be made in terms or under circumstances denoting an ill intention towards the party challenging. A knowledge of certain facts, and an opinion that those facts constitute a crime, are certainly no grounds of challenge, for it is clearly settled that a juryman cannot be challenged by reason of his having pronounced a verdict of guilty against another person charged by the same indictment." After citing Bro. Abr., Chall., 55 and 90, Fitzh. Abr., Chall., 22, 7 H. 6, 25, 21 H. 7, 29, and 49 E. 3, 1, he continues : " These ancient authorities show that expressions used by a juryman are not a cause of challenge unless they are to be referred to something of personal ill-will towards

the person challenging; and also that the juryman himself is not to be sworn where the cause of challenge tends to his dishonour; and to be sure it is a very dishonourable thing for a man to express ill-will towards a person accused of crime, in regard to the matter of his accusation.    And accordingly we find it established in later times, namely, at the trial of *Peter Cook*, 13 St. Tr. 334 . . .  that such questions are not to be put to the juror himself.  So that all the authority in the law on this head is against the defendants, and shows that the refusal of the lord chief baron to allow the proposed questions to be answered by the special jurymen was most proper and agreeable to law."   The opinion is also found in *Rex* v. *Edmonds*, 4 B. & Ald. 471.

*Ramadge* v. *Ryan*, 9 Bing. 333 (1832), was an action for libel, in which the jury returned a verdict for the plaintiff for 400*l*. An action brought by the plaintiff against Wakely for substantially the same libel was tried the day before, and the jury gave the plaintiff ½*d* in damages.   The defendant obtained a rule *nisi* for a new trial, on the ground that Hart, one of the jurors, was present during the trial of the suit against Wakely, and at its conclusion said, " I shall be on the jury to-morrow, and I will take care that the verdict does not go that way—he had heard quite enough, and that his mind was made up as to the verdict he should give." Hart deposed that his words were, " Well, I am surprised at such small damages : had I been upon the jury I certainly should have given very heavy damages.  I am upon the jury to-morrow."   The rule was discharged, for the reason that it was not established that Hart said " he would take care the verdict should not go the same way."   The court held that the words charged would, but that the admitted words would not, have been a cause of challenge. *Alderson*, J., said, " Though the expressions which the juror admits himself to have used were imprudent, yet his entertaining a strong opinion on a former verdict is not incompatible with his giving a correct verdict on the case which was to come before him. . . .  There is nothing in the language which he admits which would lead one, independent of manner, to assume that he had prejudged the verdict he was himself to give."

In *Regina* v. *Hughes*, 2 Cr. & Dix 396, 400 (1842), (Joy Chall. 206, 207), on a challenge of a juror upon the ground that he had formed and expressed an opinion on the merits, *Crampton*, J., charged the triers as follows : " The issue you are sworn to try is, whether the juror called stands indifferent between the crown and the prisoner.   It means this, whether he be partial to one side or the other,—whether any partiality exists in the mind of the juror in favour of the crown and against the prisoner. You cannot enter into the mind of the juror to know what his feelings may be, but such must be ascertained by evidence.   Here it is proposed to prove that the juror does not stand indifferent to the prisoner, by proving a declaration made by him at the last

assizes, and according to the evidence of the witness the juror did declare at the last trial of the prisoner that he had expressed an opinion of the guilt or innocence of the prisoner at the bar, or some of those charged with this crime. A mere expression of opinion as to the guilt or innocence of a person charged with a crime, arising out of any cause save malice or ill-will, is no ground for challenging a juror. If, from the declaration made by this gentleman, you should be led to think he has any ill-will towards the prisoner, any personal feeling against him, you will find against the crown and in favour of the challenge; but if you think, from the notoriety of the facts naturally coming to the knowledge of the juror, he made a mere declaration of opinion on such matters without any ill-will or personal feeling towards the prisoner, you will find against the challenge." Counsel for the prisoner objected to this way of leaving the question to the triers, and submitted it should be whether the juror had in fact formed any opinion as to the prisoner's guilt or innocence. *Crampton*, J. : "The result of your argument would be, that a second or a third trial could never be had in any county. I do not feel the least doubt upon the subject." Joy Chall. 205.

The conclusion upon all the English authorities is, that opinions formed upon the merits and expressed even in a manner indicating malice or ill-will are a ground of challenge to the favor only, and that mere expressions of opinion will not sustain the challenge.

*Temple* v. *Sumner*, Smith (N. H.) 226 (decided in 1808, but not published until 1879), was a motion for a new trial, because one of the jurors was present and heard the evidence at a former trial, had formed and declared an opinion against the defendant, and when the jury were empanelled untruly declared that he had not heard the cause tried and had not formed or expressed any opinion. *Smith*, C. J. : "Supposing the facts established—and I think they are clearly established—was it good cause of challenge? It is amongst the most essential rights of our citizens to be tried by judges, which includes jurors, as impartial as the lot of humanity will admit. Const., Part I, *art.* 35. This is no new right granted by the constitution. The common law speaks the same language. 1 Sell. 475 ; Gilb. C. P. 95, &c. The theory of the common law is, that jurors should come to a trial with minds like white paper, upon which prejudice, passion, or calumny, hope, interest, or fear, have made no stain or blot. 'The law has so watchful an eye to the pure and unbiased administration of justice, that it will never trust the passions of mankind in the decision of any matter of right.' 3 Burr. 1856. . . . In England the distinction [between principal challenges and challenges to the favor] seems to have arisen from the circumstance that the writ to the sheriff to summon the jury laid down certain rules for his government; such as that the persons summoned should be free and lawful men of the county, of certain qualifications in point of property, by whom

the truth of the matter might be better known, and who are in no wise of kin to either party.   This writ was supposed to specify all causes of objection from partiality or incapacity.   The word 'free' was understood to mean not only one having freehold lands, but freedom of mind—one who stands indifferent, no more inclining to the one side than the other.   If the person returned by the sheriff manifestly did not come within the intent of the writ, this was a principal challenge; and the court, on being ascertained of the fact, declared the juror incompetent.   But experience soon showed that there might be other circumstances which induced a suspicion of partiality, though no express malice or favor.   Here the court referred it to certain persons [the triers], to judge in their discretion and conscience whether the juror was indifferent as he stood unsworn.   .   .   .   In some books we find it laid down that if the juror hath declared his opinion touching the matter, it is a principal challenge.   In others, where the principal challenges are professed to be enumerated, we find this omitted.   3 G. Bacon 756; 2 Tidd 780; Trials per Pais 141; Trial of Fries, 2d appendix, 42. But neither of these quotes any authority.   .   .   .   The truth is, that having previously declared an opinion may afford evidence more or less strong, according to the circumstances, of suspicion of bias or partiality.   If a man had heard a cause, and should merely express an opinion in favor of one party, it would afford but slight evidence of bias or partiality.   .   .   .   Knowledge is no proof of malice, and knowledge of the particular cause no exception to a juror; certainly it was none in ancient times.   The circumstances attending the transaction must determine whether the juror is indifferent or not.   5 St. Tr. 8vo 125 [*Cook's Case*, 13 How. St. Tr. 311–338].   Our statute mentions this as a cause of challenge, *ed.* 1805, *p.* 108.   Indeed it allows the party to ask the juror if he is sensible of any prejudice in the cause.   His prejudices may be proved, and everything which goes to show that he does not stand indifferent.   Cases may easily be supposed where it would be extremely inconvenient to lay it down as a rule, that the mere declaration of an opinion, especially a general opinion, should disqualify a juror."

*Rollins* v. *Ames*, 2 N. H. 349 (1821), was a motion for a new trial, on the ground that Martin, before whom as a magistrate the plaintiff took depositions read on the trial, was foreman of the jury. The court held the objection a cause of challenge to favor only. No other question of law was decided.   *Woodbury*, J., says,—" It is well known that magistrates are often selected for the purpose of taking depositions, who, if not unfriendly to the opposite party, are favorably disposed to him who employs them.   This fact, connected with the circumstance that no person can easily hear the testimony on only one side of a cause without forming some opinion as to the case, furnishes a good ground for the presumption of a probable partiality.   .   .   .   This challenge in England is deter-

mined by triers, but here the court uniformly decide on its valid-ity; and we entertain no doubt that in the present instance it should prevail, if it had been taken seasonably." In other words, the court declared that upon the evidence reported they would have found as matter of fact that the juror was not indifferent.

State v. Webster, 13 N. H. 491 (1843), was an indictment for larceny of a horse. The defendant was first tried on an indict-ment for entering a shop and stealing property therefrom. The evidence on this trial tended to prove that the defendant was also guilty of stealing the horse. Immediately after the jury in that case retired, a jury was empanelled in the present case. In reply to inquiry, several jurors stated that they were present during the former trial, and had formed an opinion from the evi-dence in that case. The counsel for the defendant objected to them on the ground that they were not impartial and had pre-judged the case, but the objection was overruled. It was held that the objection should have been sustained; and a new trial was granted. Gilchrist, J., says,—" The commonest regard to justice would require that a party should not be compelled to trust even his property—much less, as in this case, his reputation and lib-erty— to the action of a tribunal by whom the merits of his case had been prejudged. It is immaterial in what manner a juror becomes biased. The question is, Is he impartial, or is he not? He will be unfitted to do justice to the parties, whether he derive his impressions from reading the newspapers, from common report, from casual conversations with his neighbors, or from hear-ing witnesses testify in a court of justice." The case received little consideration. The distinction between challenges for princi-pal cause and to the favor was apparently overlooked. It suffi-ciently appears, from the cases above cited, that one who was present as a spectator and heard the evidence in one case was not for that reason alone disqualified by intendment of law from serving as a juror in the next case on substantially the same issue. No common-law instance of a principal challenge for that cause is found in the books. The contrary was held in Durell v. Mosher, 8 Johns. 445, in Atkinson v. Allen, 12 Vt. 619, and in Whitner v. Hamlin, 12 Fla. 18. It was a ground of challenge to favor, and the judgment in State v. Webster is to be considered merely as a determination of fact.

State v. Howard, 17 N. H. 171, decided in 1845, was an indict-ment for murder. On a previous trial the jury failed to agree. Some of the jurors, on inquiry, answered that they had heard con-siderable said respecting the case, and, being objected to for that reason by the defendant, the court ordered that they be passed; but subsequently, after more than one hundred and fifty jurors had been called without completing the jury, the court ruled that it was not a sufficient legal objection to a juror that he had heard about the case; and others having answered in the same way, the

court refused to set them aside for that reason, they declaring that
they were not aware that they had formed any opinion, and that
they were not sensible of any bias.  The defendant moved for a
new trial, and introduced depositions of several witnesses showing
that one of the jurors, "some two months before the trial, said at
different times that he had no doubt that the defendant killed
Phebe Hanson, and that he ought to be hung without judge or
jury;" that another "said, a week or ten days.after the murder,
that if he was on the jury he would hang him [the defendant]
certainly, and that at other times he said that he ought to be
hung, and that if he was on the jury he would hang him," and that
two other jurors had made similar declarations.  The affidavits of
these jurors were introduced by the state, and each testified that
he had no recollection of using such language, that he had in fact
formed no opinion and had no bias.  *Parker*, C. J., says (*pp.* 189,
190, 192, 195),—"If it be assumed that all these jurors uttered the
words attributed to them, it is hardly necessary to say that they
are far from showing conclusively that the jurors did not in fact
stand indifferent.  We do not regard the testimony standing alone
as impeaching the honesty of the jurors.  It appeared, from the
examinations made at the time of impanelling the jury, that the
case had been a subject of conversation throughout all the
county.  It was a matter of course, under the circumstances
attending it, that it should be so; and it is but natural that
expressions like most of those attributed to these jurors should be
made, not only without any settled opinions upon the subject, but
merely as a matter of conversation, forgotten soon afterwards.
.  .  .  But the case as now presented before us has led to
inquiries whether the mere expression of an opinion by a juror in
common conversation, without anything to show ill-will, hostility,
or a fixed determination or belief, is such a legal ground of chal-
lenge under our statute that the court are to inquire no farther.
.  .  .  The weight of authority appears to be, that the expres-
sion of opinion, unless under circumstances indicating malice or
ill-will, or perhaps a fixed determination, is only a ground of
challenge to the favor.  .  .  .  The court may in its discretion
inquire under what circumstances the opinion was expressed, and
upon such inquiry determine whether the opinion was merely a
casual remark, which could have very little tendency to show
bias, and which might be entirely overcome by other circum-
stances, so as to leave no doubt that the juror stands indifferent.
If it should appear on such inquiry that the expression of opinion
indicated malice, that would furnish conclusive evidence that the
juror did not stand indifferent.  .  .  On this view of the case the
defendant is not shown to have had legal cause for principal chal-
lenge against the jurors to whom he now excepts, as having
expressed opinions before the trial; and it follows as a consequence
that he is not now entitled to a new trial, unless, upon the exam-

ination at this time of the circumstances shown in evidence, it appears that the jurors did not stand indifferent in the cause when they were impanelled.    The evidence before us does not serve to show that these jurors did not stand indifferent.    Still less is there anything indicating that they had any fixed belief, or any determination to find the defendant guilty; and the defendant therefore has not, in this view of the question and on this evidence, entitled himself to have the verdict set aside."    Neither *Temple* v. *Sumner* nor *Rex* v. *Edmonds* was cited, though undoubtedly both would have been had they come to the notice of the court.

It is a circumstance worthy of note, and entitled to great if not decisive weight upon the question, that three courts,—this court in 1808, the court of King's Bench in 1821, and this court again in 1845,—upon independent examination, came to the same conclusion, namely, that at common law the mere fact that a juror has formed and expressed an opinion upon the merits is not a ground of principal challenge, and does not necessarily disqualify him from serving on the trial, but is merely evidence to be presented and weighed with other evidence on a challenge to the favor.

In *March* v. *Railroad*, 19 N. H. 372 (1849), a juror "denied that he was sensible of any bias;" but it appeared to the court "that he had strong feelings in relation to the case," and he was excluded.    It was held that the finding, coupled with the exclusion, was in substance a finding that the juror's feelings were so strong that he did not stand indifferent; that upon his demeanor and other circumstances it might properly be so found, notwithstanding his denial of bias.

In *State* v. *Pike*, 49 N. H. 399, 407 (1870), a juror testified that he had read the reports in the newspapers, and from them derived the impression that the defendant was guilty, and that, taking the reports to be true, he should think him guilty; that he paid little attention to such reports; that notwithstanding the impression he had received from them, he thought he could try the defendant on the evidence without prejudice; and that he thought he had no opinion or impression which would prevent him from trying the defendant impartially on the evidence.    The court found him indifferent, and he was sworn.    It was held that the question of the juror's indifference was one of fact, to be decided by the court at the trial; that their decision stands like the verdict of a jury, to be reversed only when it is manifestly against law and evidence, and that there was no such ground for reversing their decision.    This fully disposed of the question.    It is in substance a judgment that a juror's impression or opinion on the merits is cause of challenge to the favor, and that the court's finding thereon, if warranted by the evidence, is final and conclusive.    *State* v. *Jones*, 50 N. H. 369, 381.

The provincial act of 1754 provided "That the justices of the respective courts aforesaid, are hereby directed, upon motion from either party in the cause to be tried, to put any juror to answer upon oath whether returned as aforesaid, or as a talis-man, whether he doth expect to gain or lose by the issue of the cause then depending? Whether he is in any ways related to either party? And whether he hath been of counsel to either party, or directly or indirectly given his opinion, or is sensible of any prejudice in the cause? And if it shall appear to the court, that such juror does not stand indifferent in said cause, he shall be set a-side from the trial of that cause, and another appointed in his stead." Prov. Laws, *ed.* 1771, *p.* 191, *s.* 3.    This statute has ever since remained in force without material alteration, except the amendments of 1842 and 1878, which do not affect the present question.    N. H. Laws, *ed.* 1789, *p.* 45; *ed.* 1797, *p.* 110; *ed.* 1805, *pp.* 108, 109; *ed.* 1815, *p.* 123; *ed.* 1830, *pp.* 467, 468; Rev. Stats., *c.* 176, *s.* 21; Gen. Stats., *c.* 194, *s.* 22; Comm. Rep. 1878, *c.* 207, *s.* 22; G. L., *c.* 213, *s.* 23.    It directed that jurors should on motion be required to answer whether they had given an opinion upon or prejudged the cause, although the answer might "touch the dishonour or discredit of the juror" (Co. Lit. 158, b), and authorized the court to try the question of their indifference instead of submitting it to triers.    In all other particulars at least, it merely reënacted the common law.    The question whether the whole statute, except as it affected the method of trial, was or was not declaratory of the common law, need not be considered.    "Indifferent" is used in the statute in its established common-law sense.    *Mayo* v. *Wilson*, 1 N. H. 53, 55.    The statute does not declare that upon proof of one or of all the causes mentioned a juror shall be deemed disqualified.    On the contrary, it assumes that a juror may have a minute and remote interest,—as, for example, in fines payable to the state or the county; may expect to gain or lose by the issue of the cause, as if his expectation is groundless; may be remotely related to one of the parties; or may have formed and expressed an opinion,—and nevertheless be found indifferent.    It "seems to imply," says *Parker*, C. J. (17 N. H. 194), "that the mere expression of opinion may not furnish cause for setting aside the juror without farther inquiry, for, although it provides that the juror may be inquired of 'whether he has, directly or indirectly, given his opinion, or has formed an opinion, or is sensible of any prejudice in the cause,' it does not provide that such an expression of opinion shall be a principal cause of challenge, or a conclusive reason for rejecting the juror, but enacts that 'if it appears that any juror does not stand indifferent in any cause, he shall be set aside.'" So *Smith*, C. J., citing the statute, says,—"All challenges are tried by the court; and if it appears to the court, judging on the broadest ground, that the juror does not stand indifferent in the cause, he is set aside." Smith

(N. H.) 229. Interrogatories not mentioned in the statute may be put to jurors, and other witnesses may be examined. *Pierce*. v. *State*, 13 N. H. 536, 554–556. Lord *Mansfield* declared "that any degree, even the smallest degree, of interest in the question depending, is a decisive objection to a witness, and much more to a juror. . . . The minuteness of the interest wo n't relax the objection. For the degrees of influence can 't be measured; no line can be drawn but that of a total exclusion of all degrees whatsoever." *Hesketh* v. *Braddock*, 3 Burr. 1847, 1856. But the jurors were in fact interested in the result of the trial of all offenders punishable by fine to the crown, or whose lands or goods were forfeited to the crown upon conviction. To kindred, also, as a ground of principal challenge, there must be a limit, notwithstanding Coke (Co. Lit. 157 a) says,—"and how far remote so ever he is of kindred, yet the challenge is good." Blackstone (3 Bl. Com. 363) puts the limit at the ninth degree. Plow. 425; 1 Chit. Cr. L. 541.

After the law required the jurors to be taken from the body of the county, and that from forty-eight to seventy-two be summoned at each term (A. D. 1730), there was in civil cases seldom occasion for challenges to the polls, and still less for trying them if made, because ordinarily it was easy to obtain out of the whole number twelve persons satisfactory to both parties. Though the statutes had no application to crown prosecutions, challenges, even in criminal cases (except, perhaps, indictments for treason and other political offences), became comparatively rare. The more enlightened views of courts and counsel led to a more liberal administration of the criminal law. In 1817 it was said that "in the case of felony, challenges are very unusual." *Brandreth's Case*, 32 How. St. Tr. 755, 776. "A challenge to the polls for cause seldom occurs in practice; for the counsel, either for the defendant or the prosecution, have only to intimate to the clerk of arraigns or clerk of the peace that they desire that a particular juror or jurors named may not be put upon the jury, and he will in general refrain from calling them." Arch. Cr. Pr. & Pl. 165. "In practice it has been usual, as a matter of courtesy, to allow peremptory challenges in civil cases and misdemeanors, but it is not a matter of right." *Parke*, B., in *Creed* v. *Fisher*, 9 Ex. 472, 474 (1854). "No one . . . ever heard of any impediment being interposed to the defendant or plaintiff in modern times, objecting to any number of jurymen without cause, and they are always withdrawn." *Parke*, B., in *Gray* v. *The Queen*, 11 Cl. & Fin. 427, 470 (1844); *Marsh* v. *Coppock*, 9 C. & P. 480; *Mansell* v. *The Queen*, 8 E. & B. 54, 103–106, 111–113; *Reg.* v. *Blakeman*, 3 Car. & K. 97. In practice, there was little occasion for invoking the strict law relating to the qualification of jurors. It fell into disuse, and a critical examination of it became unnecessary. Text-writers stated merely the general doctrine, without going into particular distinctions, or attempting to draw the line accurately

between challenges for principal cause and to the favor. Thus Buller, writing in 1767, says,—" If a juryman be related to either party, or interested in the cause, or have declared his opinion, or have been arbitrator in the cause, it is a good cause of challenge; but I do not enter at large into these matters, because, since the 3 Geo. 2, by which one panel is returned for the whole county, and not less than forty-eight in such panel, causes of challenge are not so minutely entered into as formerly." Bull. N. P. 307. " Many of those text-writers," says *Parke*, B., speaking upon the law of challenge, " the more modern particularly, only repeat those who preceded them, and the more correct notion of the common law will be obtained from the older." *Gray* v. *The Queen*, 11 Cl. & Fin. 427, 471. Upon this subject, implicit reliance can be put upon none later than the middle of the eighteenth century. Blackstone, for example, says it is a principal cause of challenge that the juror is the " party's master." 3 Bl. Com. 363. That in this he is mistaken the authorities are decisive. 21 E. 4, 67, pl. 52; 22 E. 4, 1, pl. 4; 14 H. 7, 2, pl. 6; Bro. Abr., Chall., 71, 183; Fitzh. Abr., Chall., 64; Moor 470; *Cham* v. *Matthew*, Cro. Eliz. 581; Cro. Jac. 21. It is probable that this and other errors on the subject found in the text-books were due to the liberality of modern practice—to mistaking the practice for the law.

Except on the rare occasions of difficulty in obtaining a jury, it has always been the practice in this state to excuse jurors who have heard about or have knowledge of the facts in issue, without stopping to inquire into the extent and character of their information. *State* v. *Howard*, 17 N. H. 171, 190, 194. Hence the impression widely prevalent among those of the profession who have had no occasion to examine the subject, that a knowledge of any of the facts in issue legally disqualifies a juror. A similar practice has doubtless prevailed in other states. To this practice, in part at least, may be due some of the early and little considered judgments,—as, for example, *Tweedy* v. *Brush*, Kirby 13 (1786), *Blake* v. *Millspaugh*, 1 Johns. 316 (1806), *State* v. *Godfrey*, Bray. 170 (1817),—that at common law a juror is disqualified by a formed and expressed opinion.

The decisions in this country on the subject are numerous and conflicting. An extended review of them is not practicable, nor would it be profitable. A few of them are collected in 1 Bish. Cr. Proc. (3d ed.), s. 909 n., and in the notes to *Smith* v. *Eames*, 36 Am. Dec. 515, 521–534. In many of the states the causes of challenge are regulated by statute. The early departure from the common law has been corrected in some states by legislation and in others by judicial action.

The New York courts, beginning with *Blake* v. *Millspaugh*, *supra*, held that an opinion formed, whether expressed or not, whether founded on knowledge or on reports, and though the juror believed he could try the case impartially, was a ground of principal challenge,

and, as matter of law, a disqualification. *Pringle* v. *Huse*, 1 Cow. 432, 435 ; *Ex parte Vermilyea*, 6 Cow. 555 ; *People* v. *Vermilyea*, 7 Cow. 108, 121–130 ; *People* v. *Mather*, 4 Wend. 229 ; *People* v. *Bodine*, 1 Denio 281 ; *People* v. *Honeyman*, 3 Denio 121 ; *Cancemi* v. *People*, 16 N. Y. 501. Under this doctrine it was found difficult in many cases to obtain a jury. In 1844 Mary Bodine was indicted in Richmond county for the murder of her brother's wife and of his child, for arson, for burglary, and for receiving stolen goods. She was tried in that county on one of the indictments for murder, and the jury failed to agree. An application by the defendant for a change of venue was denied. *People* v. *Bodine*, 7 Hill 147. Another attempt made to try her in that county on the same indictment failed, because of the impracticability of obtaining an indifferent jury. The indictments were then removed into the supreme court, and sent to the New York circuit to be tried. In March, 1845, the defendant was tried on the indictment for murder and found guilty. The verdict was set aside for error in impanelling the jury (*People* v. *Bodine*, 1 Denio 281), and the case came on for a new trial in November, 1845, "at which time about three weeks were spent in the effort to obtain a jury, and over six thousand jurors were summoned : about four thousand were tried on challenges, and all set aside but ten." The parties being satisfied that a jury could not be obtained, the trial was suspended by consent. The venue was subsequently changed to Orange county, where the defendant was tried and acquitted. *People* v. *Bodine*, 1 Edm. Sel. Ca. 36, 82, 95. "Of these six thousand persons summoned as jurors, probably not fifty were legally disqualified from serving; and instead of fifteen days being fruitlessly expended, and thousands being called away from their business, half an hour would have sufficed for impanelling an impartial jury had the process been regulated by the rules of the common law instead of those arbitrarily imposed by the supreme court." 9 Month. Law Rep. 193, 199. One grave evil resulting from this departure from the doctrine of the common law was, that it enabled any one to escape jury service by merely expressing an opinion on the merits. Joy Chall. 191, 192, 207 ; 5 Alb. L. J. 81, 82. "It is reported that many [jurors] who were summoned in *Bodine's Case* had the precaution before being called to remark to a bystander, ' I think Polly Bodine ought to be hanged;' and then, when his name was announced, he truthfully confessed that he had expressed an opinion, and was excused of course." 9 Month. Law Rep. 193, 200. To obtain a jury in any case of public interest and notoriety was difficult. In the case of Foster, tried for murder in 1871, over one thousand jurors were summoned and a week's time consumed in getting a jury. 4 Alb. L. J. 281.

To remedy the mischief, the legislature enacted in 1872 (Laws of 1872, *c*. 475) that "the previous formation or expression of an opinion or impression in reference to the circumstances on which

any criminal action at law is based, or in reference to the guilt or innocence of the prisoner, or a present opinion or impression in reference thereto, shall not be a sufficient ground of challenge for principal cause, provided the person proposed as juror shall declare on oath that he verily believes that he can render an impartial verdict according to the evidence, and that such opinion or impression will not bias or influence his verdict, and provided the court shall be satisfied that the proposed juror does not entertain such a present opinion as would influence his verdict as a juror." The act was reënacted in the Code of Criminal Procedure, s. 376. *People* v. *Casey*, 96 N. Y. 115, 118. As construed and administered, it goes far towards restoring the common law. Under it the court holds that notwithstanding a juror has formed, expressed, and still entertains an opinion upon the merits which it will require evidence to remove, yet if he declares on his oath that he believes, and the court finds, that he can render an impartial verdict according to the evidence, he is a competent juror. *People* v. *Willson*, 109 N. Y. 345, 351; *Balbo* v. *People*, 80 N. Y. 484; *Cox* v. *People*, 80 N. Y. 500; *People* v. *Buddensieck*, 103 N. Y. 487. In *Stokes* v. *People*, 53 N. Y. 164, the act was held constitutional, upon the ground that it was intended to secure and does secure a fair and impartial trial. The court say (*pp.* 171, 172),— "Any act of the legislature providing for the trial otherwise than by a common-law jury composed of twelve men would be unconstitutional and void, and any act requiring or authorizing such trial by a jury partial or biased against either party would be a violation of one of the essential elements of the jury referred to and secured by the constitution." It is, in legal effect, a judgment that the statute is declaratory of the common law.

It was held in Vermont that one who has expressed an opinion upon the merits is not a competent juror, although when called at the trial he testifies that he has then no opinion and can try the case impartially upon the evidence. *State* v. *Godfrey, supra; State* v. *Clark*, 42 Vt. 629 (1870). It is no objection to a juror that he heard the evidence at a former trial of the case and formed an opinion thereon, if he has not expressed it. *Boardman* v. *Wood*, 3 Vt. 570 (1831). In *State* v. *Phair*, 48 Vt. 366 (1875), the court were urged but declined to hold that an opinion formed upon the merits, though never expressed, disqualifies a juror. *Royce*, J., delivering the opinion, says (*p.* 377),—" If any new rule is to be adopted, it seems to me it would be more reasonable not to make the formation and expression of an opinion the arbitrary test of a juror's competency, but to permit an inquiry to be made as to the facts and circumstances upon which the opinion was formed; and if upon such inquiry it should be found that the juror was free from bias or prejudice, and could and would fairly and impartially judge of the matters to be submitted to him, he should be held to be competent." This near approach to the common law was adopted

in substance by the court and declared to be the doctrine of the common law in *State* v. *Meaker*, 54 Vt. 112, 123 (1881). Several jurors who had formed opinions from reading the newspapers and had expressed them, but stated that their opinions depended upon the correctness of the newspaper reports, that they were conscious of no bias or prejudice for or against either party, and that they could try the case impartially according to the evidence, were there held competent. This seems to be the settled doctrine in that state. *State* v. *Meyer*, 58 Vt. 457.

In 1786 it was held in Connecticut that one who had given his opinion was disqualified from serving as a juror in the cause. *Tweedy* v. *Brush*, Kirby 13. In the later cases the expression of opinion is held to be cause of challenge to the favor only, and the question of the juror's competency is determined by the court upon all the evidence. *State* v. *Potter*, 18 Conn. 166, 171–175 (1846); *State* v. *Allen*, 46 Conn. 531, 546, 547 (1879); *State* v. *Hoyt*, 47 Conn. 518, 530, 531 (1880). "Nineteen twentieths of the intelligent men of the county where a homicide has taken place, and the fact with the circumstances attending it has been published in the newspapers, would be incapacitated from sitting as jurors if the objections raised in this case were well founded. All of them would read the account, or hear the facts detailed by some one who had read them. Most of them would form just such opinions, or get just such impressions, as the jurors had in this case. And if we were to adopt the principles and sustain the objections which have been urged upon us, we should open our courts to just such judicial farces as the one which has recently been acted in the case of Foster in the city of New York. That state of things we must avoid; and we are satisfied that the jurors selected under our system can be relied upon to try cases impartially and upon the evidence given in court, notwithstanding they may have heard or read accounts of the transaction, and formed an opinion, if such it may properly be called, therefrom. Opinions thus formed are not in their nature such as should disqualify a juror. If he is free from partiality or prejudice derived from any other source, his opinion is, as a matter of course, hypothetical, not fixed or settled in the sense in which those terms are used, when used correctly, in the law. All men take newspaper statements as current news, liable to qualification, explanation, or contradiction, and when qualified, explained, or contradicted, they change their opinions or belief accordingly, as matter of course. . . . The mind of the juror having such an opinion, impression, supposition, or belief . . . is certainly in no worse situation than the mind of a juror, who has heard one side in court making a *prima facie* case, is to hear the defence when made upon the other side, and give it its just weight. . . . The opinion must be formed in such a way, or be of such a character, that hostility or prejudice toward the prisoner may be inferred from its existence

or expression.    But hostility or prejudice cannot as a rule be inferred from an opinion formed and expressed simply from reading or hearing stated, as current news of the day, the fact of a homicide and the circumstances attending it.    There should be found some other circumstances,—of relationship, partiality, prejudice, hostility, or ill-will,—acting at the same time upon the mind and giving it a bias, or the juror should be accepted.    The court in its determination should be guided rather by the existence, or the absence, of such other circumstances, which might have affected the reports read or heard, or may be operating directly upon the mind of the juror, and assisting the reports to create a bias or prejudice which renders him not indifferent."    *State* v. *Wilson,* 38 Conn. 126, 138–140 (1871).

In New Jersey by reason of the practice it came to be supposed that "the expression or even the formation of an opinion by a juror as to the guilt of the accused disqualified the juror, and was ground of principal challenge."    *Moschell* v. *State*, 53 N. J. Law 498.    The question was apparently for the first time judicially considered in *State* v. *Spencer*, 21 N. J. Law 196 (1846).    It was there held that it is not a ground of principal challenge that a juror has formed and expressed an opinion founded upon either a knowledge of the facts or upon information supposed to be true, and that a declaration of opinion to disqualify a juror must be such as implies malice or ill-will against the prisoner.    *Hornblower,* C. J., says (*pp.* 198, 199),—" It has been supposed that an opinion of guilt, founded upon newspaper reports or other information, or personal knowledge, disqualifies a man from being a juror. But this is not so.    .    .    .    And I have no hesitation in saying that a bystander who witnesses a homicide, or any other breach of the peace, is a perfectly competent juror—as much so as a witness to a bond or other contract between private parties would be on a trial concerning such bond or contract.    .    .    .    A declaration of opinion to disqualify a juror therefore must be such an one as implies malice or ill-will against the prisoner, thereby showing that the person challenged does not stand indifferent between the state and him.    This is the uniform language of the books and cases which are of authority under our constitution, as well as of the English courts up to the present time."    The question was re-examined, and the same conclusion reached, in *State* v. *Fox*, 25 N. J. Law 566 (1856), and *Moschell* v. *State, supra* (1888).    In the former case (25 N. J. Law 592, 593), *Green*, C. J., after citing *Cook's Case* and other English authorities, says,—" These cases, extending from the reign of Henry VI nearly to the present time, a period of more than four hundred years, fully sustain the rule adopted in *The State* v. *Spencer*.    They show that by the rule of the common law the mere expression of an opinion as to the prisoner's guilt or innocence, not arising from malice or ill-will, does not disqualify the juror, and that such declaration is in

itself no evidence of the existence of malice or ill-will. There are occasional *dicta* and cases to be found in the English books indicating that the mere expression of an opinion unfavourable to the prisoner is in itself a cause of challenge. But that such is not the recognized rule of law is abundantly evident from the fact that the question is never suffered to be asked of the juror himself whether he has expressed such opinion; but the fact must be established by other evidence. The ground of this practice is, that the question tends to bring scandal or infamy on the juror. But if the question is merely designed to prove that the juror has expressed an opinion founded on his knowledge of the case, or from having read or heard the evidence, or from common rumor, unconnected with any feeling of malice or ill-will, it can by no possibility involve any degree of infamy, reproach, or moral turpitude. The rule of evidence applicable to the proof of the cause of challenge affords the strongest evidence of what the ground of challenge really is. . . . The very terms of the challenge, *propter affectum,* for affection, imply a moral bias, partiality, or prejudice. A mind heated by passion, excited by controversy, or inflamed by party strife, labors under a moral bias. Where this is proved to exist, the challenge may be sustained. But knowledge is not prejudice. Wherever there is knowledge, from the very nature of the human mind there must be opinion, and the strength of the opinion will ordinarily be proportioned to the extent of the knowledge. In a community like ours, where intelligence of every kind is widely diffused, rapidly circulated, and eagerly sought after, to affirm that every one who acquires information of a crime, and forms, as every man capable of thought must form, some opinion in regard to it, is laboring under a moral bias which perverts the judgment, is to affirm what is contrary to all reason and experience, and in direct conflict with the truth. The doctrine, carried to its legitimate conclusions, excludes the most intelligent class of citizens, and those best qualified to serve as jurors. It practically disqualifies every man who reads and thinks. Instead of purifying, it emasculates the jury-box; and where the experiment has been fully tried, the lessons of experience have in this particular confirmed the deductions of reason. There may be minds so constituted that every ray of light necessarily produces obliquity of vision. But that is not the normal condition of the mind, and it cannot be wise to predicate a legal principle upon a mere anomaly."

"I am not prepared to say," says *Andrews,* J., in *Balbo* v. *People,* 80 N. Y. 495, 496, "that it is contrary to human experience or the principles of mental philosophy, or that it may not frequently happen, that persons who have formed opinions of the guilt of an accused person from reports or statements, verbal or written, may not as jurors lay aside their prepossessions, and not only honestly and conscientiously endeavor to hear and decide the case upon the

evidence, but be able in fact to divest themselves of the influence of their previous opinions. It may. I think, be safely affirmed, that the consciousness of such prepossessions would in many cases induce on the part of jurors a more cautious consideration and a more charitable construction of the evidence against the prisoner. . . . There may be cases where the opinion of the juror has been formed under circumstances which, in the judgment of all reasonable men, will prevent him, however conscientious he may be, from judging and deciding the case irrespective of his prepossessions. . . . The circumstances under which the opinion was formed, its strength, the fact whether the juror has any personal feeling against the prisoner, or exhibits any pride of opinion which may lead him to give too little or too much weight to evidence in favor of or against the accused,—these and many other considerations will enter into the judgment of the court in passing upon the question of the juror's competency."

Justice required that the defendant should be tried by persons "best qualified to serve as jurors." G. L., c. 213, ss. 1, 4, 10. Such persons generally form, and frequently express, opinions of the guilt and the deserts of the accused, in a case of this kind, before the trial. Upon newspaper report they often declare with emphasis that he ought to be hung, and that they would hang him if they were on the jury. There is no occasion for surprise when those who have been the most violent in such denunciation, being impanelled in his case, are led by the evidence and a sense of responsibility to take a firm stand on the other side. State v. Howard, 17 N. H. 171, 187, 188. In cases of startling crime, and others of public interest and notoriety, all intelligent residents of the county "best qualified to serve as jurors" now stand in the position occupied by the residents of the immediate neighborhood of a like transaction four hundred years ago. Few, if any, can be found who have not formed an opinion of more or less strength before the cause comes to trial. Information given by the public press differs in no respect from oral hearsay. Its weight and effect upon the mind depend in part upon the supposed reliability of the informer. However unreliable he may be deemed, it may create some impression. The difference between an impression and an opinion—even a "fixed and settled" opinion—is a difference of degree only. However weak it may be, further consideration or further information is necessary to change it. When persons drawn for jury service say they have formed opinions which it would take evidence to remove (Hopt v. Utah, 120 U. S. 430, 434, 435), or (as in this case) have formed opinions which are so strong that it would require evidence to change them, a portion of their testimony is superfluous. In belief, as in the material world, changes do not occur without reason. Opinions are not formed or abandoned without cause. If all the residents of the county (being otherwise competent) whose opinion of this case

could only be changed by evidence were excluded from the jury, the defendant could not be tried. The possibility or probability of obtaining jurors who had not formed an opinion was properly considered. *State* v. *Howard*, 17 N. H. 171, 196, 197. The question was not whether those examined as to their judicial competency could change their minds without cause, but whether they could and would disregard the information they had received and the opinions they had formed concerning the case, and render a verdict on nothing but the evidence given them during the trial. This was a question of fact to be determined at the trial term. *March* v. *Railroad*, 19 N. H. 372, 375, 376; *State* v. *Pike*, 49 N. H. 399, 406, 407; *Rowell* v. *Railroad*, 58 N. H. 514.

*Exceptions overruled.*

DOE, C. J., did not sit; the others concurred.